**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 07-352 |
| ) | Judge Nora Barry Fischer |
| SAMUEL J. MANFREDI and ) | |
| MARILYN T. MANFREDI, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

On September 25, 2007, a grand jury returned an eight-count indictment against Samuel J.

Manfredi ("Mr. Manfredi") and Marilyn T. Manfredi ("Mrs. Manfredi") (collectively, "Defendants")

charging both with the following crimes: (1) at Count One with conspiracy to commit offenses

against the United States under 18 U.S.C. § 371 including income tax evasion in violation of 26 U.

S.C. § 7201, filing false tax returns in violation of 26 U.S.C. § 7206(1) and structuring currency

transactions in violation of 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2; (2) at Counts Two, Three and

Four with income tax evasion in violation of 26 U.S.C. § 7206(1); and (3) at Count Eight with

structuring currency transactions in violation of 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2. (Docket

No. 2). The indictment also charges Samuel J. Manfredi, only, at Counts Five, Six and Seven with

filing false tax returns in violation of 26 U.S.C. § 7206(1). *Id.* This matter is before the Court on

Defendants Samuel J. Manfredi and Marilyn T. Manfredi's remaining Pretrial Motions upon which

oral argument was heard on December 22, 2008.

As a preliminary matter, the Court has granted Defendant Samuel J. Manfredi's "Motion to

Adopt and Join In Motions of Co-Defendant" (Docket No. 43) and Defendant Marilyn T. Manfredi's "Motion to Join Motions filed by Co-Defendant" (Docket No. 50). Accordingly, when applicable, the Court will discuss each Pretrial Motion as they pertain to both Defendants.

The Court also previously denied seven of Defendants' Pretrial Motions in a Memorandum Opinion and Order issued on June 27, 2008, 2008. (Docket No. 86). In said Order, the Court denied the following motions previously filed by Defendants:

A. *Motion for Disclosure of 404(b) Evidence* (Docket No. 29);

B. *Motion for Revelation of Identity of Informants* (Docket No. 51);

C. *Motion to Preserve Evidence* (Docket No. 55);

D. *Motion for Government Disclosure of Rule 807 "Residual Exception" Statements* (Docket No. 46);

E. *Motion for Pretrial Disclosure of All* <u>*Brady*</u> *Materials* (Docket No. 48);

F. *Motion for Discovery and Notice of Intention to Use Evidence* (Docket No. 32);

G. *Motion for Search of Personnel Files of Government Agency Witnesses* (Docket No. 45);

Presently before the Court are six additional Pretrial Motions in which both Defendants have joined (to the extent applicable to each). The pending Pretrial Motions include the following:

H. *Motion to Dismiss Count One for Alleging Multiple Conspiracies* (Docket No. 38);

I. *Motion to Dismiss Counts One, Five through Seven, and Eight For Failing To State an Offense and All of Its Forfeiture Allegations For Being Predicated on Defective Counts One and Eight* (Docket No. 40);

J. *Motion to Dismiss Indictment's Forfeiture Allegations* (Docket No. 34);

K. *Motion for Bill of Particulars by Defendant Samuel Manfredi* (Docket No.

36);

L.    *Motion for Bill of Particulars by Defendant Marilyn Manfredi* (Docket No. 31); and

M.    *Motion for Severance from Co-Defendant by Marilyn Manfredi* (Docket No. 53).

## II.    BACKGROUND

The indictment alleges the following facts.  At all times material to the indictment, Aquarian and Associates Incorporated ("Aquarian"), was a modeling and talent agency owned by Defendant Samuel J. Manfredi and incorporated in the Commonwealth of Pennsylvania.  (Docket No. 2 at ¶¶ 1-2).  Aquarian conducts modeling and talent auditions and shows in various cities in the United States and generates its revenue through registration fees for clients who participate in their shows. (Docket No. 2 at ¶¶ 2-3).  "Aquarian also sold various 'extras' at the shows, such as photographs and t-shirts." (Docket No. 2 at ¶ 3). The registration fees and extras were paid by Aquarian's business clients and customers through cash, personal checks, money orders, and credit cards. (Docket No. 2 at ¶3).  The alleged mishandling of these business activities, running from March 16, 1998 to April 15, 2004, forms the basis of the Grand Jury's indictment against Defendants.  (Docket No. 2 at ¶4).

### A.    *Count One - Conspiracy under 18 U.S.C. § 371*

Count One charges that Defendants knowingly and willfully combined, conspired, confederated, and agreed together and with one another to commit offenses against the United States, in violation of 26 U.S.C.§§ 7201 and 7206(1), and 31 U.S.C. § 5324(a)(3), that is: "(a) to evade and attempt to evade U.S. Individual income taxes; (b) to subscribe to and file false U.S. Income Tax Returns for an S-Corporation; and (c) to structure U.S. currency transactions with domestic financial

institutions." (*Id*. at 1-2).

1. Manner and Means of the Conspiracy

Specifically, the indictment alleges that the following facts were done, made, or caused to be done as part or in furtherance of the conspiracy. Defendants "collected the business receipts of Aquarian and deposited and caused the deposit of the checks, money orders and credit card payments into Aquarian business accounts but did not deposit all of the cash receipts into the business accounts." (*Id*. at ¶5). Samuel Manfredi "provided or caused to be provided deposit slips reflecting the deposits into Aquarian bank accounts to an independent accountant retained" by him. (*Id*. at ¶6). Rather than "depositing all of the cash receipts earned from Aquarian business operations into business accounts," Defendants "used some of the cash to purchase postal money orders, certificates of deposit, annuities and personal property, including a Mercedes Benz automobile." (*Id*. at ¶7). The Postal Money Orders were purchased from United States Post Offices, "where they purchased United States Postal Money Orders by structuring the purchases with currency in amounts calculated to avoid required filings of funds transaction reports." (*Id*. at ¶ 8).

In addition, Defendants allegedly opened "205 accounts at 25 financial institutions in the Western District of Pennsylvania, including certificate of deposit and annuity accounts, savings accounts and other accounts" which were used to deposit Aquarian cash receipts. (*Id*. at ¶ 9). Defendants "also structured the deposit of currency, along with money orders, into certificate of deposit, annuity, savings and other bank accounts in the Western District of Pennsylvania in amounts calculated to avoid required filings of currency transaction reports." (*Id*. at ¶10). Further, Defendants allegedly did not report all cash receipts from Aquarian business operations to their independent accountant. (Docket No. 2 at ¶11). As such, the accountant who prepared Defendants'

Aquarian and personal tax returns was unaware of the existence of the cash receipts and did not include them as income of Aquarian on the United States Income Tax Returns for an S Corporation (Form 1120S) or Defendants' Joint Individual Income Tax Returns (Form 1040). (*Id*. at ¶ 11).

It is alleged that Samuel J. Manfredi, reviewed, signed, and caused to be filed with the Internal Revenue Service ("I.R.S.") Aquarian's United States Income Tax Return for an S Corporation prepared by the independent accountant with the knowledge that the gross receipts of all of the cash generated by Aquarian business operations had not been included in the independent accountant's calculations. (*Id*. at ¶ 12). Similarly, it is alleged that both Defendants reviewed, signed, and caused to be filed with the I.R.S. the United States Joint Individual Income Tax Returns prepared by the independent accountant with the knowledge that the gross receipts of all of the cash generated by Aquarian business operations had not been included in the independent accountant's calculations. (*Id*. at ¶ 13).

2.    Overt Acts

It is further alleged that the following overt acts "[i]n furtherance of the conspiracy, and to effect its objects and purposes" were committed by Defendants in the Western District of Pennsylvania. (*Id* at ¶ 14).

Specifically, on or about July 22, 2002, Samuel J. Manfedi falsely stated to a Special Agent of the I.R.S., Criminal Investigation, and a United States Postal Inspector, "that he reported all Aquarian cash receipts as income on Aquarian's corporate tax returns," even though he knew that he "did not report all of the cash receipts on Aquarian corporate tax returns." (*Id*. at ¶ 15).

On or about March 30, 2000, both Defendants allegedly traveled to 17 different United States Post Offices to purchase approximately 74 United States Postal Money Orders with cash, totaling

$42,300.00. (*Id*. at ¶16). Each money order was made payable to Bobby Rahal Motorcar Company ("Rahal"). In addition, on or about April 3, 2000, Marilyn T. Manfredi purchased a 2000 Mercedes Benz automobile at Rahal "by providing that company in partial payment for the automobile a total of approximately 86 United States Postal Money Orders having a total value of $50,000.00, and $8,800.00 in United States currency." (*Id*. at ¶ 17). Further, that on or about April 25, 2002, Marilyn T. Manfredi "purchased with United States currency a total of 9 United States Postal Money Orders having a total value of $6,300.00 at United States Post Offices in Norwood, Massachusetts. The money orders were made payable to either Samuel J. Manfredi or Marilyn T. Manfredi." (*Id*. at ¶ 18).

On or about April 15 of each year between 1999 and 2003, Defendants caused the filing of United States Individual Income Tax Returns (Form 1040) in the Western District of Pennsylvania, allegedly knowing that the returns did not report the correct amount of income received by them for that year. (Docket No. 2 at ¶19). Similarly, Samuel J. Manfredi caused the filing of United States Income Tax Returns for an S Corporation (namely Aquarian) for each year between 1999 and 2003, allegedly with the knowledge that the "returns did not report the correct amount of income received by Aquarian for that fiscal year." (*Id*. at ¶ 20).

| Fiscal Year Ending Date | Filing Date |
|---|---|
| 1. March 31, 1999 | 02/14/1999 |
| 2. March 31, 2000 | 12/15/2000 |
| 3. March 31, 2001 | 12/17/2001 |
| 4. March 31, 2002 | 12/14/2002 |
| 5. March 31, 2003 | 12/17/2002 |

(*Id*.).

B.    *Counts Two through Four - Income Tax Evasion under 26 U.S.C. § 7201 and 18 U.S.C. § 2*

Counts Two through Four each allege a violation of 26 U.S.C. § 7201[1] and 18 U.S.C. § 2[2] for Defendants' alleged attempts to evade taxes owed to the United States of America by filing fraudulent United States Joint Individual Income Tax Returns (Form 1040) with the knowledge that the amount of taxable income listed on each return was understated. (Docket No. 2 at 8-10).

Count Two charges that Defendants reported on their Form 1040 that their taxable income for the calendar year of 2001 was $204,368.00 and that the amount of taxes due and owing for that year was $55,298.00. (*Id*. at 8). It is alleged that this filing was made by Defendants with knowledge that their taxable income for 2001 was actually $391,618.00 for which they owed $125,166.00 in income taxes. (*Id*.).

Similarly, Count Three charges that Defendants reported on their Form 1040 that their taxable income for the calendar year of 2002 was $226,306.00 and that the amount of taxes due and owing for that year was $60,476.00. (*Id*. at 9). It is further alleged that this filing was made by Defendants with knowledge that their taxable income for 2002 was actually $522,286.00 for which they owed $171,687.00 in income taxes. (*Id*.).

Likewise, Count Four charges that Defendants reported on their Form 1040 that their taxable

---

[1] *See* § IV(A)(3)(a) *infra*.

[2] 18 U.S.C. § 2 provides that:

> a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

income for the calendar year of 2003 was $371,029.00 and that the amount of taxes due and owing for that year was $105,905.00. (*Id*. at 10). It is further alleged that this filing was made by Defendants with knowledge that their taxable income for 2003 was actually $407,010.00 for which they owed $115,755.00 in income taxes. (*Id*.).

C.  *Counts Five through Seven - Income Tax Evasion under 26 U.S.C. § 7206(1) against Defendant Samuel J. Manfredi, only*

Counts Five through Seven each allege a violation of 26 U.S.C. § 7206(1)[3] for the years of 2001-2003. Specifically, each count alleges that "Samuel J. Manfredi did make and subscribe as president of Aquarian a United States Income Tax Return for an S Corporation, Form 1120S ... which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said United States Income Tax Return for an S Corporation the defendant did not believe to be true and correct as to every material matter" as the return reported certain gross receipts for each year, on lines 1a and 1c, when Defendant well knew that Aquarian had gross receipts that were substantially greater than that reported. (*Id*. at 11). The allegedly understated reported gross receipts and corresponding filing dates for the corporate tax returns were filed are as follows. Count Five charges that the corporate tax return filed on or about December 14, 2001 for the fiscal year ending March 31, 2001 reported $987,565.00 as gross receipts. (*Id*. at 11). Count Six charges that the corporate tax return filed on or about December 12, 2002 for the fiscal year ending March 31, 2002 reported 1,056,330.00 as gross receipts. (*Id*. at 12). Finally, Count Seven charges that the corporate tax return filed on or about December 15, 2003 for the fiscal year ending March 31, 2003 reported $1,436,640.00 as gross receipts. (*Id*. at 13).

---

[3]

*See* § IV(A)(3)(a) *infra*.

D.    *Count Eight - Structuring Currency Transactions under 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2*

Count Eight charges Defendants with evasion of the reporting requirements under 31 U.S.C. § 5313(a)[4] by structuring, assisting in structuring, and causing to be structured, transactions with domestic financial institutions in violation of 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2.[5] (*Id.* at 14). The transactions below constitute the basis of the evasion and structuring charge in Count Eight:

> $1,000.00 deposit to Dollar Bank on 5/17/2002;
>
> $9,000.00 deposit to Enterprise Bank on 5/17/2002;
>
> $9,000.00 deposit to Laurel Bank on 5/17/2002;
>
> $8,257.00 deposit to Parkvale Savings Bank on 5/17/2002; and
>
> $9,000.00 deposit to PNC Bank on 5/17/2002.

(*Id.*).

E.    *Forfeiture Allegations*

The allegations in Count One and Count Eight are re-alleged and incorporated for the purpose of alleging criminal forfeitures pursuant to 31 U.S.C. § 5317(c)(1)(A)[6] which incorporates 21 U.S.C. § 853.[7] (Docket No. 15). It is alleged that Defendants obtained the following property as a result of the violations set forth in Count One and Count Eight, and as such, the following property is

---

[4] *See* § IV(A)(3)(a) *infra*.

[5] *See* n. 2 *supra*.

[6] *See* § IV(A)(4)(a) *infra*.

[7] *See* § IV(A)(4)(b) *infra*.

subject to forfeiture to the United States of America:

> (a) United States currency, postal money orders, and bank accounts including bank account   no. 923164 at the Greek Catholic Union, 5400 Tuscarawas Road, Beaver, Pennsylvania 15009; and
>
> 2) a 2000 Mercedes Benz vehicle.

(*Id.*).  It is further alleged that if by act or omission of Defendants that said property cannot be located then by due diligence, it has been sold or deposited to a third person, it has been placed beyond the jurisdiction of the Court, has been substantially diminished in value, or has been co-mingled with other property which cannot be divided without difficulty then other property may be forfeited in lieu of the items listed, pursuant to 31 U.S.C. § 5317(c)(1)(A) which incorporates 21 U.S.C. § 853(p).   (*Id.*).

## III.    PROCEDURAL HISTORY

The instant indictment was filed on September 27, 2007.  (Docket No. 2).  Both Defendants were arraigned on November 1, 2007 at which time each entered a plea of not guilty as to all charges against them.  (Docket Nos. 13, 14 and 15).  Defendants each filed a first motion for extension of time to file pretrial motions on November 5, 2007 (Docket Nos. 21, 22), which was granted by the Court on the same day (Docket Nos. 23, 24), extending the period for the filing of pretrial motions until February 14, 2008.  Then, on January 23, 2008, Defendants filed their respective second motions for extension of time to file pretrial motions.  (Docket Nos. 25, 27).  Said motions were likewise granted by the Court on the same day, extending the period for the filing of pretrial motions until May 14, 2008.  (Docket Nos. 26, 28).

On May 13, 2008, Defendants filed a series of pretrial motions.  (Docket Nos. 29, 31, 32, 34, 36, 38, 40, 42, 43, 45, 46, 48, 50, 51, 52, and 55).  The Government then filed a motion for extension

of time in which to file responses to Defendants' motions. (Docket No. 61). The Government's motion was granted by the Court (Docket No. 62), extending the period of time in which the Government had to file a response until June 20, 2008. The Government filed responses to several of the motions on June 16, 2008 (Docket Nos. 64, 65, 66, 67, 68, 69, 70), and others on June 20, 2008 (Docket Nos. 71, 72, 73). After receiving another extension of time from the Court, the Government filed responses to the remaining pretrial motions on June 23, 2008. (Docket Nos. 76 and 77).

As noted, the Court granted both Defendants' motions to adopt the motions of their co-defendant on June 26, 2008. (Docket Nos. 84, 85). Thereafter, on June 27, 2008, the Court issued a Memorandum Opinion and Order denying several of Defendants' pretrial motions related to discovery. (Docket No. 86). Defendant Marilyn Manfredi then filed a motion seeking leave of court to file a reply to the Government's response to her motion for severance (Docket No. 89), which was granted by the Court on July 8, 2008 (Docket No. 90). After receiving an extension of time in which to file her reply, Defendant Marilyn Manfredi filed her reply brief on September 26, 2008. (Docket No. 95). Finally, on December 15, 2008, the Government filed its Notice Regarding Recent Decision in Middle District of Pennsylvania Relevant to the Motions for Severance. (Docket No. 99).

The Court initially scheduled a hearing on Defendants' pretrial motions to occur on July 25, 2008. (Docket No. 82). Thereafter, on June 30, 2008, Defendant Marilyn Manfredi filed a motion to continue the hearing (Docket No. 87), which was granted by the Court, rescheduling the hearing to occur on September 26, 2008 (Docket No. 88). The Government then filed a motion to continue the hearing date on July 15, 2008 (Docket No. 91), which was granted by the Court, rescheduling

the hearing for October 29, 2008 (Docket No. 92). Subsequently, on October 6, 2008, the Court rescheduled the hearing to take place on November 21, 2008. (Docket No. 96). Defendant Samuel Manfredi objected to this hearing date and requested another continuance (Docket No. 97), which was granted by the Court, and the hearing was again rescheduled for December 22, 2008 (Docket No. 98).

Ultimately, the Court heard oral argument on the pending motions at the pretrial motion hearing on December 22, 2008, taking said motions under abeyance. (Docket Nos. 100, 101). At said hearing, the parties asserted that no further briefing was necessary. Accordingly, the pending motions are now fully briefed and ripe for disposition.

## IV. DISCUSSION

The Court now turns to the merits of Defendants' arguments set forth in their remaining pretrial motions and will address the motions as follows: first, the motions to dismiss the indictment and forfeiture allegations; second, the motions for a bill of particulars; and, third, Defendant Marilyn Manfredi's motion for severance.

### A. *Motions to Dismiss*

#### 1. Legal Standard

Defendants have moved to dismiss certain charges in the indictment against them under Rule 12(b) of the Federal Rules of Criminal Procedure. (*See* Docket Nos. 38, 40). Specifically, Rule 12(b)(3) provides that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to ... state an offense." FED. R. CRIM. P. 12(b)(3).

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that "[t]he indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense

charged" and "must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." FED. R. CRIM. P. 7(c)(1). "Rule 7 put an end to the rules of technical and formalized pleading which had characterized an earlier era. The complex requirements of common law criminal pleading are now obsolete, harmless imperfections of form are now disregarded, and the fine detail previously demanded at the pleading stage is [no] longer required." 1 WRIGHT, KING, KLEIN & LEOPOLD, FEDERAL PRACTICE & PROCEDURE, CRIMINAL 3D § 123 (2008)(citations omitted). "An indictment is generally deemed sufficient if it: (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (citing *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989)); *see also United States v. Resendiz-Ponce*, 127 S.Ct. 782 (2007). "Moreover, 'no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.'" *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)(quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989)). Finally, "[i]n considering a defense motion to dismiss an indictment, the district court accepts as true the factual allegations set forth in the indictment." *United States v. Besmajian,* 910 F.2d 1153, 1154 (3d Cir. 1990).

The Court is mindful of this standard as it addresses each of the Defendants' challenges to the indictment, in turn.

2.    <u>Motion to Dismiss Count One for Alleging Multiple Conspiracies</u> [38]

13

Defendants first challenge Count One of the indictment, arguing that it fails to state an offense because it improperly alleges multiple conspiracies with similar purposes rather than a single conspiracy with multiple objects. (Docket No. 39 at 2). They also assert that neither the alleged tax evasion and false filings nor structuring violations constitute a continuing offense such that the offenses may be encompassed by a single conspiracy. (Docket No. 39). As, such, Defendants contend that the conspiracy charged at Count One impermissibly charges Defendants with criminal conduct that took place beyond the statute of limitations for each underlying offense. (*Id.*). In response, the Government maintains that dismissal is not warranted as Count One properly alleges that Defendants formed a single agreement to commit the multiple objectives contained in that count. (Docket No. 71).

Count One of the indictment charges Defendants with conspiracy to commit certain offenses against the United States under 18 U.S.C. § 371. Section 371 provides, in pertinent part, that:

> [i]f two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.[8] A conspiracy is defined as the agreement of conspirators to commit one or more

---

[8]

The Court notes that Defendants have been charged with a conspiracy to commit certain offenses against the United States under 18 U.S.C. § 371 which is a distinct offense from a conspiracy to defraud the United States under the same statute, commonly referred to as a *Klein* conspiracy. *See United States v. McKee*, 506 F.3d 225, 238 n. 10 (3d Cir. 2007)(citing *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957)). "In order to prove a conspiracy to defraud the United States in violation of 18 U.S.C. § 371 [...], the evidence must establish the following elements beyond a reasonable doubt: (1) an agreement to defraud the United States, (2) an overt act by one of the conspirators in furtherance of that objective, and (3) any conspirator's commission of at least one overt act in furtherance of the conspiracy." *McKee*, 506 F.3d at 238 (citing *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir.1989)).

offenses where at least one of the parties acts to further the object of the conspiracy. *Braverman v. United States*, 317 U.S. 49, 52 (1942). While several conspiracies may be charged upon the commission of multiple offenses, multiple conspiracies need not be charged where the offenses were committed pursuant to a single agreement. The Supreme Court has explained that:

> ... when a single agreement to commit one or more substantive crimes is evidenced by an overt act, as the statute requires, the precise nature and the extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

*Braverman*, 317 U.S. at 53. Further, the United States Court of Appeals for the Third Circuit has held that "[a]lthough its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *United States v. Bobb*, 471 F.3d 491, 494-495 (3d. Cir. 2006), *cert. denied*, 127 S. Ct. 2083 (2007)(citing *Braverman*, 317 U.S. at 53).

Defendants do not contest that a single conspiracy can have multiple objects, however, they argue here that the tax evasion and structuring offenses under 26 U.S.C. §§ 7201 and 7206(1) and 31 U.S.C. § 5324(a)(3), respectively, are not continuing offenses and are completed upon the actor's filing of a tax return or the final allegedly structured transaction with a financial institution. (Docket No. 39). Defendants also maintain that they could not have formed a single agreement to commit violations of these statutes. (*Id.*). Therefore, Defendants contend that Count One should have been broken into several conspiracy charges; each charge corresponding to a tax return for a particular year or to a particular series of structuring transactions. (Docket No. 39 at 4). Lastly, Defendants

argue that if Count One was charged in this manner, that some of the conduct charged in Count One would be barred by the statute of limitations for the tax offenses, which is six years under 26 U.S.C. § 6531.[9]

Defendants rely on *United States v. Goldberg*, 206 F.Supp. 394 (E.D. Pa. 1962) in support of their position.[10] In *Goldberg*, the defendant was the president and sole owner of 13 corporations,

---

[9]

26 U.S.C. § 6531 provides, in pertinent part, that:

> No person shall be prosecuted, tried, or punished for any of the various offenses arising under the internal revenue laws unless the indictment is found or the information instituted within 3 years next after the commission of the offense, except that the period of limitation shall be 6 years--
>
> ...
>
> (2) for the offense of willfully attempting in any manner to evade or defeat any tax or the payment thereof;
>
> ...
>
> (5) for offenses described in sections 7206(1) and 7207 (relating to false statements and fraudulent documents);
>
> ...
>
> (8) for offenses arising under section 371 of Title 18 of the United States Code, where the object of the conspiracy is to attempt in any manner to evade or defeat any tax or the payment thereof.

26 U.S.C. § 6531.

[10]

The Court notes that the defendant in *Goldberg* was convicted after a jury trial and he appealed his conviction and sentence to the United States Court of Appeals for the Third Circuit. *See United States v. Goldberg*, 330 F.2d 30, 31 (3d Cir. 1964). The Court of Appeals affirmed his conviction and sentence. *Goldberg,* 330 F.2d at 43. However, the holding of the district court upon which Defendants rely was not appealed.

16

most of which were tied to a linen supply business. *Goldberg*, 206 F.Supp. at 396. He was charged with two counts of tax evasion for the years of 1955 and 1956, which were also included in a single conspiracy count. *Id.* The district court found that "[a] willful attempt to evade the tax for one year is a separate offense from a like attempt to evade for another year." *Id.* (citing *United States v. Sullivan*, 98 F.2d 79, 80 (2d Cir. 1938)). The district court then held that "because of the criminal intent necessary for the substantive offense of attempted tax evasion, we conclude that a single conspiracy embracing two separate taxable years is impossible." *Id*. at 396-397. Accordingly, the district court granted the defendant's motion challenging the sufficiency of the indictment with respect to the count alleging a conspiracy to evade taxes. *Id.* at 407.

In the instant case, the Government disputes Defendants' reliance on *Goldberg*, arguing that:

> …the [D]efendants also rely on a 46 –year old case decided in the Eastern District of Pennsylvania … In the *Goldberg* case, the judge ruled that the government could not charge a single conspiracy which had, as its objective, the evasion for several distinct tax periods. The reasoning in that case was quickly rejected by the Fifth Circuit later that same year in *Lott v. U. S.*, 309 F.2d 115, 120 (5th Cir. 1962). It was also rejected by the Court in *U. S. v. Baker*, 262 F. Supp. 657, 684 (D.D.C. 1966). In short, the judge's rationale in the *Goldberg* case has never been approved or cited as authoritative in any published opinion. That is because it is an incorrect interpretation of conspiracy law.

(Docket No. 71 at 3).

The district court's decision in *Goldberg* is not controlling and this Court does not find its reasoning persuasive. As argued by the Government, the United States Court of Appeals for the Fifth Circuit in *Lott* and the District Court for the District of Columbia in *Baker* did, in fact, reject the reasoning of the district court in *Goldberg* which found that a conspiracy to commit tax evasion could not encompass offenses occurring in more than one tax period. *See Lott v. United States*, 309

17

F.2d 115, 120 (5th Cir. 1962)(rejecting appellants' argument based on *Goldberg* and finding that a charge in an indictment of conspiracy to commit tax evasion over multiple tax periods was sufficient); *United States v. Baker*, 262 F.Supp. at 684-685 (citing *United States v. Haskell*, 327 F.2d 281 (2d Cir. 1964), *cert. denied* 377 U.S. 945 (1964))(rejecting defendant's argument based on *Goldberg* because a single conspiracy "to evade taxes for two or more years has been sustained"); *see also United States v. Shorter*, 608 F.Supp. 871, 879 (D.C.D.C.,1985)("the Court concludes that tax evasion covering several years may be charged in a single count as a course of conduct in circumstances such as these where the underlying basis of the indictment is an allegedly consistent, long-term pattern of conduct directed at the evasion of taxes for these years."). Further, while *Goldberg* does not appear to have been explicitly overturned by the United States Court of Appeals for the Third Circuit, subsequent decisions of the Court of Appeals and district courts within this Circuit demonstrate that its reasoning should not be applied to the facts of the instant matter.

The decision by the Court of Appeals in *United States v. Pollen*, 978 F.2d 78 (3d Cir. 1992) is instructive. In *Pollen*, the Court of Appeals upheld the defendant's conviction (pursuant to a guilty plea) on four counts of tax evasion under 26 U.S.C. § 7201, each of which encompassed the same period of seven years, but charged the defendant with conduct stemming from four discrete acts of attempted evasion.[11] *Pollen*, 978 F.2d at 82-83. The indictment in that matter alleged in separate counts that the defendant attempted to evade taxes over the seven year period by completing the

---

[11]

The Court notes that the defendant in *Pollen* did not challenge the indictment by filing a pretrial motion to dismiss as the defendant pled guilty to the charges, but later asserted a Double Jeopardy challenge to the same on appeal. *Pollen*, 978 F.2d at 84 ("a defendant who pleads guilty to a criminal charge may subsequently assert a claim of multiple punishment in violation of the Double Jeopardy Clause only if the violation is apparent on the face of the indictment or record.")(quotation omitted).

following acts: (1) placing $690,000 worth of gold bars in a Canadian bank with instructions to transfer it to a bank in Switzerland; (2) placing an additional $250,000 in the same bank with similar instructions; (3) engaging in a continuous scheme and course of conduct to conceal assets from the IRS including the use of "currency, money orders, and cashiers checks to buy assets and pay expenditures" using nominees to conceal his expenditures; and (4) placing $350,000 in gold bars and coins, jewelry, and gems in safety deposit boxes at a North Carolina bank under a fictitious name. *Pollen*, 978 F.2d at 82.

In *Pollen*, the Court of Appeals was presented with the issue of "whether a defendant can be charged and punished separately for several distinct affirmative acts of evasion committed with regard to taxes owed for the identical set of years." *Id*. at 85. The Court of Appeals found that the indictment at issue was not improperly multiplicitous on its face and denied the defendant's appeal on Double Jeopardy grounds, finding that the charging of separate offenses based on the circumstances of the case was permissible. *Id*. at 86-87. In so doing, the Court of Appeals explained that it was permissible for the Government to charge a defendant with tax evasion for each individual year but that it was also "permissible under section 7201 to charge tax evasion covering several years in a single count as a 'course of conduct' in circumstances 'where the underlying basis of the indictment is an allegedly consistent, long-term pattern of conduct directed at the evasion of taxes for these years.'" *Id*. at 84 (quoting *United States v. Shorter*, 809 F.2d 54, 58 (D.C.Cir. 1987), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 35 (1987)). The Court of Appeals was explicit in its holding that it was not authorizing the "charging of separate acts of evasion of a single year's taxes in distinct counts" and declined to address what it described as a more difficult question of "whether the language of section 7201 would support the splintering of the offense of tax evasion

into a number of attempts greater than the number of calendar years for which taxes were evaded."
*Id.* at 87.

The decision in *Pollen* has been interpreted by district courts within the Third Circuit in such a manner to permit the Government to charge a defendant with conspiracy to commit tax evasion under section 7201 for multiple tax periods, *United States v. Kruckel*, Crim. A. No. 92-611, 1993 WL 765648, *21 (D. N.J. Aug. 13, 1993)(not reported), and to charge a defendant with a single count of tax evasion under section 7201 which encompasses multiple tax periods based on an alleged continuing course of conduct or scheme to evade taxes during that period, *United States v. Root*, 560 F.Supp 2d 402, 415 (E.D. Pa. 2008).

In this Court's estimation, in light of these subsequent decisions, the district court's holding in *Goldberg*, that "a single conspiracy embracing two separate taxable years is impossible" no longer remains controlling. *Goldberg*, 206 F.Supp. at 396-397. The Court also declines to extend the reasoning in *Goldberg* to the other criminal objects of the conspiracy charge at Count One, i.e., conspiracy to commit the offenses of structuring currency transactions under 31 U.S.C. § 5324(a)(3) and filing false corporate tax returns under 26 U.S.C. § 7206(1). This Court will not create an exception to the general rule that "[a]lthough its objectives may be numerous and diverse, a single conspiracy exists if there is one overall agreement among the parties to carry out those objectives." *Bobb*, 471 F.3d at 494-495 (citations omitted).

The allegations in Count One of the indictment charge that Defendants knowingly and willfully combined, conspired, confederated, and agreed together and with one another to commit offenses against the United States, in violation of 26 U.S.C.§§ 7201 and 7206(1), and 31 U.S.C. § 5324(a)(3), that is: "(a) to evade and attempt to evade U.S. Individual income taxes; (b) to subscribe

to and file false U.S. Income Tax Returns for an S-Corporation; and (c) to structure U.S. currency transactions with domestic financial institutions." (Docket No. 2 at ¶ 4). Count One further alleges the details of the manner and means in which the conspiracy was carried out by Defendants and sets forth certain overt acts that Defendants allegedly committed in furtherance of the conspiracy. (*Id*. at ¶¶ 5-20). Accordingly, the Court finds that the indictment charges Defendants with a single conspiracy to commit multiple offenses against the United States. To the extent that Defendants continue to contest same, "[t]he issue of whether a single conspiracy or multiple conspiracies exist is a fact question to be decided by a jury." *Bobb*, 471 F.3d at 494 (citing *United States v. Perez*, 280 F.3d 318, 344 (3d Cir.2002); *United States v. Curran*, 20 F.3d 560, 572 (3d Cir.1994)).[12] Based on the foregoing, Defendants' Motion to Dismiss Count One for Alleging Multiple Conspiracies [38] is DENIED.

> 3. <u>Motion to Dismiss Counts One, Five through Seven and Eight for Failing to State an Offense and All of its Forfeiture Allegations for Being Predicated on Defective Counts One and Eight</u> [40]_____

> a. Count One

Defendants contend that Count One of the indictment must be dismissed for failure to state an offense as the Grand Jury has not "adequately charged that defendants Manfredi had the requisite degree of knowledge and intent necessary to agree to violate 26 U.S.C. §§ 7201 and/or 7206(1) and/or 31 U.S.C. 5324(a)(3)." (Docket No. 41 at 6-7). Defendants essentially argue that the

---

12

The Court notes that the statute of limitations for violations of 18 U.S.C. § 371 is five years under 18 U.S.C. § 3282 and "runs from the last overt act during the existence of the conspiracy." *Fiswick v. United States*, 329 U.S. 211, 216 (1946); *United States v. Jake*, 281 F.3d 123, 129 n. 6 (3d Cir. 2002). The allegations in the indictment appear to fall within the applicable statute of limitations.

indictment fails to state a claim because it does not set forth all of the elements of both the conspiracy charge and the underlying offenses. *Id.* Specifically, Defendants maintain that the indictment does not allege the *mens rea*[13] element of each underlying offense. The Government responds that "[a]lthough Count One does not allege each and every element of the offenses which are the objectives of the conspiracy, it is well-settled that conspiracy indictments need not allege all of the elements of the offense which the defendants are accused of conspiring to commit." (Docket No. 76 at 3). The Government relies on *Wong Tai v. United States*, 273 U.S. 77, 81 (1927) and *United States v. Werme*, 939 F.2d 108, 112 (3rd Cir. 1991), *cert. denied*, 502 U.S. 1092 (1992), in support of its position.

In *Wong Tai*, the Supreme Court held that:

> [i]t is well settled that in an indictment for conspiring to commit an offense-in which the conspiracy is the gist of the crime-it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy, or to state such object with the detail which would be required in an indictment for committing the substantive offense. In charging such a conspiracy "certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is" necessary.

*Wong Tai*, 273 U.S. at 81 (internal citations and quotations omitted). Likewise, the United States Court of Appeals for the Third Circuit in *Werme* found that:

> [t]o be legally sufficient, a conspiracy count in an indictment need only set forth the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act. A conspiracy indictment need not allege every element of the underlying offense,

---

[13]

    "*Mens rea*" is defined as "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime; criminal intent or recklessness." BLACK'S LAW DICTIONARY (8th ed. 2004).

> but need only put defendants on notice that they are being charged
> with a conspiracy to commit the underlying substantive offense.

*Werme*, 939 F.2d at 112 (internal citations omitted). The Court of Appeals explained that this is so because "'in a conspiracy count, the conspiracy is the gist of the offense ... [and the indictment] need not plead the substantive offense letter-perfect because the purpose of the conspiracy may have been accomplished even though such activity fell short of completing a substantive offense.'" *Id*. (quoting *United States v. Knox Coal Co.*, 347 F.2d 33, 38 (3d Cir. 1965).[14] However, a conspiracy indictment is insufficient if it merely relies on a statutory citation, i.e., if it alleged that defendant participated in a conspiracy to commit 26 U.S.C. § 7201. *Id*. at 112 n. 1.

When evaluating the legal sufficiency of a conspiracy indictment, this Court is to consider the following.

> The charging portion of a conspiracy count includes all paragraphs
> within that count except for allegations under the overt acts heading,
> unless those allegations are expressly incorporated by reference. In
> addition, the charging portion of a conspiracy count may not rely
> upon other counts within the indictment to cure deficiencies, unless
> those counts too are expressly incorporated by reference.

*Werme*, 939 F.2d at 111-112 (citations omitted). While the allegations under the overt acts heading may not be considered as part of the charging portion of the indictment unless expressly incorporated by reference, the allegations under the plan and purpose heading may be so considered. *Id*. at 112 n. 1.

Here, the indictment charges that Defendants knowingly and willfully combined, conspired,

---

[14]

At oral argument, defendant counsel acknowledged that the pleading requirements for a substantive offense are a little bit more onerous on the part of the Government than those for purposes of a conspiracy count. (Docket No. 101 at 8).

confederated, and agreed together and with one another to commit violations of 26 U.S.C.§§ 7201 and 7206(1), and 31 U.S.C. § 5324(a)(3), and further alleges violations of these statutes requires one "(a) to evade and attempt to evade U.S. Individual income taxes; (b) to subscribe to and file false U.S. Income Tax Returns for an S-Corporation; and (c) to structure U.S. currency transactions with domestic financial institutions." (Docket No. 2 at ¶ 4). This paragraph does not explicitly charge Defendants with the required *mens rea* of each underlying offense, i.e., that Defendants willfully conspired to willfully evade and attempt to evade U.S. Individual income taxes. However, in this Court's estimation, this alleged omission does not render the indictment fatal, as the indictment puts Defendants on notice of the charges against them and the allegations contained under the "Manner and Means of the Conspiracy"[15] heading of the indictment sufficiently detail the required *mens rea* of each underlying offense. (Docket No. 2 at ¶¶ 5-13). The Court now turns to the underlying substantive offenses and the corresponding allegations of the indictment.

With respect to the charge of conspiracy to unlawfully structure transactions, 31 U.S.C. § 5324(a)(3) provides that:

> (a) No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section...
> ...
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324. Count One charges, in part, that Defendants knowingly and willfully conspired

---

15

The Court equates the "Manner and Means of the Conspiracy" heading to the Plan and Purpose heading discussed by the Court of Appeals in *Werme.*

to commit violations of 31 U.S.C. § 5324(a)(3), "that is ... [t]o structure U.S. currency transactions with domestic financial institutions." (Docket No. 2 at ¶ 4). The allegations under the "Manner and Means of the Conspiracy" heading of the indictment provide that Defendants "purchased United States Postal Money Orders by structuring the purchases with currency in amounts calculated to avoid required filings of funds transaction reports" and "structured the deposit of currency, along with money orders, into certificate of deposit, annuity, savings and other bank accounts in the Western District of Pennsylvania in amounts calculated to avoid required filings of currency transaction reports." (*Id*. at ¶¶ 8, 10). These allegations set forth that Defendants acted in a manner to structure their purchases of money orders and deposits in financial institutions in amounts calculated to avoid the filing of currency transaction reports, necessarily implying that Defendants knew of such requirements. Thus, the indictment clearly informs Defendants of this charge against them and enables Defendants to plead a former acquittal or prosecution in the event of any subsequent prosecution.

Defendants are also charged as part of the conspiracy with conspiring to commit tax evasion under 26 U.S.C. § 7201, which provides that:

> [a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

26 U.S.C. § 7201. "Willfully" in this context is defined as "the voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). The instant indictment charges that Defendants willfully and knowingly conspired to commit violations of 26 U.S.C. §

7201, "that is ... to evade and attempt to evade U.S. Individual income taxes" and that they "reviewed and signed, and caused to be filed with the Internal Revenue Service, the U.S. Joint Individual Income Tax Returns (Form 1040) prepared by the independent accountant, *knowing* that they did not include as taxable income all of the cash generated by Aquarian business operations." (Docket No. 2 at ¶¶ 4, 13)(emphasis added). Given theses allegations and the applicable standard discussed above, it is clear that the indictment sufficiently charges that Defendants engaged in a conspiracy to commit offenses against the United States in violation of 26 U.S.C. § 7201.

Finally, the conspiracy count charges Defendants, in part, with conspiracy to violate 26 U.S.C. § 7206(1), which provides that:

> [a]ny person who ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

26 U.S.C. § 7206(1). "Willfully" as used in section 7206(1) is also defined as a "voluntary, intentional violation of a known legal duty." *Cheek*, 498 U.S. at 201. Count One charges that Defendants knowingly and willfully conspired to violate section 7206(1) "that is ... [t]o subscribe to and file false U.S. Income Tax Returns for an S Corporation" and that Samuel J. Manfredi "reviewed and signed, and caused to be filed with the Internal Revenue Service, the U.S. Income Tax Returns for an S Corporation (Form 1120S) which were prepared by the independent accountant, *knowing* that they did not include as gross receipts all of the cash generated by Aquarian business operations." (Docket No. 2 at ¶¶ 4,12)(emphasis added). Given the applicable standard for the

sufficiency of conspiracy indictments, and considering the allegations in Count One, the indictment sufficiently apprises Defendants of the charge of conspiracy to commit violations of 26 U.S.C. § 7206(1).

Accordingly, Defendants' Motion to Dismiss Count One is DENIED.

> b.    Counts Five, Six and Seven (Against Samuel Manfredi only)

Defendant Samuel Manfredi also contends that Counts Five, Six and Seven of the Indictment alleging violations of 26 U.S.C. § 7206(1) should be dismissed for failure to charge that he acted "willfully" in filing a false return. (Docket No. 41). In response, the Government argues that "[b]y alleging that defendant Samuel Manfredi 'well knew' that he was filing a false, understated income tax return under penalties of perjury, the indictment clearly alleges that the defendant was intentionally violating a known legal duty, i.e., acting willfully." (Docket No. 76 at 5).

26 U.S.C. § 7206(1) provides that:

> [a]ny person who ... [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

26 U.S.C. § 7206(1). In *United States v. Gollapudi*, the United States Court of Appeals for the Third Circuit set forth the elements that the government is required to prove for a conviction under section 7206(1), that:

> (1) defendant made and subscribed a return which was false as to a material matter; (2) the return contained a written declaration that it was made under the penalties of perjury; (3) defendant did not believe the return was true and correct as to every material matter; and (4)

> defendant falsely subscribed to the return willfully, with the specific
> intent to violate the law.

*United States v. Gollapudi*, 130 F.3d 66, 71 -72 (3d Cir. 1997)(citing *United States v. Bishop*, 412 U.S. 346, 350 (1973)). Further, as stated above, "the standard for the statutory willfulness requirement is the voluntary, intentional violation of a known legal duty." *Cheek*, 498 U.S. at 201.

The Government maintains that the Third Circuit does not require that an indictment explicitly mirror the exact statutory language as argued by Defendant here, relying on *United States v. Tykarsky*. In *Tykarsky*, the Court of Appeals noted that "[f]ailure to allege the statutory elements will not be fatal provided that alternative language is used or that the essential elements are charged in the indictment by necessary implication." *United States v. Tykarsky*, 446 F.3d 458, 474 (3d Cir. 2006)(quoting *Gov't of the Virgin Islands v. Moolenaar*, 133 F.3d 246, 249 (3d Cir.1998)).

In this Court's estimation, the indictment sufficiently charges the essential elements of a violation of 26 U.S.C. § 7206(1), including the element of willfulness, by necessary implication. It is alleged that Defendant "well knew" that he subscribed false corporate tax returns, under the penalties of perjury. While the term "willfully" as set forth in the statute is not used in the indictment,[16] the use of the term "well knew" connotes that Defendant acted in a voluntary, intentional manner and in violation of a known legal duty. *See United States v. Fruehauf Corp.*, 577 F.2d 1038, 1071 (6th Cir. 1978)(finding that indictment which charged that the defendant "then and there well knew" that certain tax liabilities were understated alleged that the defendant had "a willful

---

[16]
    The Government conceded at oral argument that "willfully" should have been included in the indictment regarding Counts Five through Seven. (*See* Docket No. 101 at 12)("The word 'willfully' is not used in the indictment and, technically speaking, it should have and in the future we will make sure that that word is there. Nevertheless, the element, even though that particular word -- the element of willfulness is expressly alleged in different words.")

state of mind"). The remaining allegations in each count further support this result. Therefore, the Court finds that the allegations in Counts Five, Six and Seven sufficiently allege the element of willfulness under 26 U.S.C. § 7206(1) by necessary implication.

Accordingly, Defendant's Motion to Dismiss Counts Five, Six and Seven is DENIED.

c.    Count Eight

Defendants next maintain that Count Eight is deficient in that "the Grand Jury failed to allege that defendants, in fact, knew that any of the financial institutions here at issue had any reporting requirement." (Docket No. 41). The Government contends that the allegations contained in the indictment sufficiently charge all of the required elements of 31 U.S.C. § 5324.

31 U.S.C. § 5324(a)(3) provides:

> (a) No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section...
> ...
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324(a)(3). The parties do not dispute that one of the elements that the Government must prove at trial is that Defendants "knew that a financial institution was legally obligated to report currency transactions in excess of $10,000." (Docket No. 76 at 6). Count Eight of the indictment does not explicitly state that Defendants had knowledge of the reporting requirements. However, the allegations contained in Count Eight sufficiently allege this element by necessary implication. First, the allegations in Count Eight mirror the statutory language of 31 U.S.C. § 5324(a)(3). (Docket No. 2 at 14). Second, it is alleged that Defendants acted with the purpose of evading the

reporting requirements of 31 U.S.C. § 5313(a) and one cannot purposefully act to evade these requirements without knowledge of such requirements. (*Id.*). Third, as stated, Count Eight contains an explicit reference to the statutory section that contains the reporting requirements. Section 5313(a), provides, in pertinent part, that:

> [w]hen a domestic financial institution is involved in a transaction for the payment, receipt or transfer of coins or currency...in an amount...the Secretary prescribes by regulation, the institution...shall file a report on the transaction at the time and in the way the Secretary prescribes...

31 U.S.C. § 5313(a). Fourth, the indictment identifies the five transactions which are the basis for the structuring charge, including the date, financial institution and amount of each transaction. (*Id.* at 14). The amounts of each transaction specified in Count Eight are less than the $10,000 filing requirement contained in the regulations prescribed under 31 U.S.C. § 5313(a).[17] (*Id.*). Therefore, upon consideration of these allegations, the Court finds that the indictment sufficiently alleges all essential elements of a structuring offense. Accordingly, Defendants' motion to dismiss Count Eight is DENIED.

### d.    Forfeiture Allegations

Finally, Defendants seek dismissal of the forfeiture allegations in the indictment on the basis

---

[17]

The reporting requirements for financial institutions are set forth in 31 C.F.R. § 103.22(b), which provides that "[e]ach financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000, except as otherwise provided in this section." 31 C.F.R. § 103.22(b). These requirements are generally applicable to the Postal Service except "to payments or transfers made solely in connection with the purchase of postage or philatelic products." 31 C.F.R. § 103.22(b). Subsection (c) also sets forth additional reporting requirements related to the aggregation of multiple transactions at a single financial institution or at multiple branches of the same financial institution. 31 C.F.R. § 103.22(c).

that the underlying Counts, especially One and Eight, are defective. The Court has found that the allegations in each count of the indictment are sufficient to meet the applicable legal standard. Accordingly, Defendants' motion to dismiss the forfeiture allegations on this basis is likewise DENIED.

### e. Conclusion as to Defendants' Motion to Dismiss

Based on the foregoing, Defendants' Motion to Dismiss [40] is DENIED in its entirety because the indictment properly alleges the essential elements of the crimes charged and sets forth "sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Kemp*, 500 F.3d at 280 (quotation omitted).

### 4. Motion to Dismiss Forfeiture Allegations

Defendants have also filed a motion to dismiss the indictment's forfeiture allegations. (Docket No. 34). In the indictment, the Government seeks criminal forfeiture of certain property under 31 U.S.C. § 5317(c), re-alleging and incorporating by reference the allegations contained in Counts One and Eight. (Docket No. 2 at 15-16). Specifically, the Government seeks forfeiture of the following property:

> (a) United States currency, postal money orders, and bank accounts, including bank account no. 923164 at the Greek Catholic Union, 5400 Tuscarawas Road, Beaver, Pennsylvania 15009; and
>
> (b) a 2000 Mercedes Benz vehicle.

(Docket No. 2 at 15). Additionally, if necessary, the Government seeks substitute assets up to the value of this property. (Docket No. 2 at 15-16). Defendants set forth two arguments in support of their motion: (1) that "Section 5317(c)(1)(A) does not authorize the forfeiture of property involved in tax offenses or property related thereto" and (2) that "Section 5317(c)(1)(A) and (B) do not

authorize the forfeiture of substitute assets." (Docket No. 34). The Court will address each of Defendants' arguments, in turn.

> a. Motion to Dismiss Forfeiture Allegations Because of Multiple Conspiracies in Count One

Defendants challenge the sufficiency of the indictment's forfeiture allegations under Rule 7(c)(2) of the Federal Rules of Criminal Procedure, arguing that the forfeiture allegations contained in the indictment should be dismissed as unsupported by the statutory text of 31 U.S.C. § 5317(c). (Docket No. 34). Defendants maintain that section 5317(c) authorizes forfeiture for violations of sections 5313, 5316, or 5324 and a conspiracy to commit those offenses but that Count One of the indictment alleges a conspiracy to commit multiple offenses including tax evasion pursuant to statutory authority, namely 26 U.S.C. §§ 7201 and 7206, under which forfeiture is not authorized. (*Id*.). Defendants contend that "dismissal is the only viable remedy, because it is impossible to determine what property, if any, the Grand Jury might have charged as forfeitable had it been properly instructed about the limitations of §5317 and acted within that limited authority." (*Id.* at 4). In response, the Government argues that the forfeiture allegations are properly supported by the plain language of 31 U.S.C. § 5317, which authorizes forfeiture based on a conviction of "any conspiracy" to commit a violation of section 5324. (Docket No. 73).

Rule 7(c)(2) of the Federal Rules of Criminal Procedure mandates that:

> [n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute.

Fed. R. Crim. P. 7(c)(2). Likewise, Rule 32.2(a) of the Federal Rules of Criminal Procedure provides that:

> [a] court must not enter a judgment of forfeiture in a criminal
> proceeding unless the indictment or information contains notice to the
> defendant that the government will seek the forfeiture of property as
> part of any sentence in accordance with the applicable statute.

FED. R. CRIM. P. 32.2(a). The "applicable statute" in this instance is 31 U.S.C. § 5317. The full text

of section 5317(c) provides that:

> (c) Forfeiture.--
>
> (1) Criminal forfeiture.--
>
> (A) In general.--The court in imposing sentence for any violation of
> section 5313, 5316, or 5324 of [Title 31], or any conspiracy to
> commit such violation, shall order the defendant to forfeit all
> property, real or personal, involved in the offense and any property
> traceable thereto.
>
> (B) Procedure.--Forfeitures under this paragraph shall be governed by
> the procedures established in section 413 of the Controlled
> Substances Act.[18]

31 U.S.C. § 5317(c). Thus, based on the statutory language of section 5317(c)(1)(A) and the

allegations set forth in the indictment, forfeiture of the assets identified in Count Eight is plainly

authorized in the event of a conviction under 31 U.S.C. § 5324(a)(3). Defendants do not appear to

dispute that fact, but present the Court with what appears to be a novel issue regarding the

interpretation of the term "any conspiracy" in section 5317(c)(1)(A), as neither Defendants nor the

Government cites to a single case or any legislative history interpreting that part of the statute.

In interpreting section 5317(c)(1)(A), the Court is to "give the words of a statute their

ordinary, contemporary, common meaning, absent an indication Congress intended to bear some

---

[18]
    The procedures established in section 413 of the Controlled Substances Act as used herein
are codified at 21 U.S.C. § 853.

different import." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). There is no indication from Congress that the word "any" as set forth in section 5317(c)(1)(A) should be given a definition other than its common meaning. As discussed at length above,[19] a conspiracy under 18 U.S.C. § 371 can involve any of the following: (1) a conspiracy to commit a single offense against the United States; (2) a conspiracy to commit multiple criminal offenses against the United States; or, (3) a conspiracy to defraud the United States. *See Braverman*, 317 U.S. at 52-53; *Bobb*, 471 F.3d at 494-495; *McKee*, 506 F.3d at 238. Therefore, "any conspiracy" as used in section 5317(c)(1)(A) logically incorporates each of these described conspiracy offenses, including a multiple object conspiracy as alleged in the instant indictment.

However, Defendants argue that the Court should look beyond the plain meaning of section 5317(c)(1)(A) and dismiss the forfeiture allegations because of the indictment's inclusion of the tax offenses, under which forfeiture is not authorized. (Docket No. 35 at 3-4). Accordingly, Defendants contend that it is now "impossible" to determine what property was identified as forfeitable by the grand jury. (*Id*. at 4).

The Court finds that the allegations contained in the indictment do not support the defense's argument as the property described in the forfeiture allegations at pages 15 and 16 of the indictment mirrors that of the specific allegations that Defendants unlawfully structured purchases of postal money orders and currency deposits with financial institutions in Count One. (*See* Docket No. 2 at ¶¶ 7-9, 16-18). Further, the allegations in Count One regarding tax evasion do not identify any specific funds which were allegedly not reported to the IRS or a specific tax deficiency as do Counts

---

[19]

*See* § IV(A)(2) *supra*.

Two, Three and Four. (*See* Docket No. 2 at 8-10).

Based on the foregoing, the Court finds that the forfeiture allegations in the indictment meet the standard under Rule 7(c)(2). They sufficiently put Defendants on notice that they have an interest in property that is subject to forfeiture under 31 U.S.C. § 5317(c)(1)(A). Accordingly, Defendants' motion to dismiss the forfeiture allegations in the indictment is DENIED.

> b.    Motion to Dismiss Forfeiture Allegations of Substitute Assets

Defendants also contend that 31 U.S.C. § 5317(c)(1)(A) and (B) do not authorize the forfeiture of substitute assets. (Docket No. 35 at 4). Defendants maintain that subsection (B) incorporates only the procedures contained in section 413 of the Controlled Substances Act, and does not authorize substantive forfeiture of substitute assets. (*Id*.). In response, the Government asserts that "[c]ontrary to the defendants' contentions, the substitute asset provision at issue here, 21 U.S.C. §853(p), is procedural and is incorporated in 31 U.S.C. § 5317(c), thereby permitting the seizure of substitute assets in structuring cases." (Docket No. 73 at 7).

The Court finds the Court of Appeals' decision in *United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006) instructive in the resolution of this issue. In *Vampire Nation*, the Court of Appeals denied a challenge by the defendant to the Court's *in personam* forfeiture judgment entered against him after a conviction of mail fraud. *Id*. at 198-202. The district court's forfeiture judgment in that matter relied on 28 U.S.C. § 2461(c). Section 2461(c) provides that:

> (c) If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to to the

> Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. <u>The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.</u>

28 U.S.C. § 2461(c)(emphasis added). In *Vampire Nation*, the Court of Appeals also overruled the defendant's arguments that the district court "lacked statutory authority under 28 U.S.C. § 2461(c) to issue a criminal forfeiture of [the defendant's] mail fraud proceeds" and that the district court "could not issue a forfeiture order for an amount that exceeded [the defendant's] available assets at the time of sentencing." *Vampire Nation*, 451 F.3d at 198. In so doing, the Court of Appeals discussed that criminal forfeitures under section 2461(c) "are to be carried out pursuant to the procedures set forth in 21 U.S.C. § 853", finding that section 853(a) limited the type of property subject to forfeiture and that the district court was authorized to "direct forfeiture of 'substitute property' subject to the conditions set out in 21 U.S.C. § 853(p)." *Id*. at 201-202.

Although Defendants challenge the incorporation of 21 U.S.C. § 853(p) into the substantive forfeiture provision at 31 U.S.C. § 5317 on grounds that 21 U.S.C. § 853(p) is procedural in nature and, therefore, cannot authorize substantive forfeiture of substitute assets, in this Court's estimation, the reasoning of the Court of Appeals in *Vampire Nation* applies here and the criminal forfeiture of substitute assets is authorized, subject to the terms of section 853(p). The text of the criminal forfeiture provision for mail fraud as discussed in *Vampire Nation* and the criminal forfeiture statute for unlawful structuring at issue here both provide in similar terms that criminal forfeitures under those statutes shall be governed by the procedures in section 413 of the Controlled Substances Act. *See* 31 U.S.C. § 5317(c)(1)(B)(structuring); 28 U.S.C. § 2461(c)(mail fraud).

Turning to section 413 of the Controlled Substances Act, codified at 21 U.S.C. § 853, subsection 853(o) provides that the "provisions of [section 853] shall be liberally construed to effectuate its remedial purpose." 21 U.S.C. § 853(o). Subsection 853(p) provides that:

> (p) Forfeiture of substitute property
>
> (1) In general
> Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant--
>
> > (A) cannot be located upon the exercise of due diligence;
> >
> > (B) has been transferred or sold to, or deposited with, a third party;
> >
> > (C) has been placed beyond the jurisdiction of the court;
> >
> > (D) has been substantially diminished in value; or
> >
> > (E) has been commingled with other property which cannot be divided without difficulty.
>
> (2) Substitute property
>
> In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.
>
> (3) Return of property to jurisdiction
>
> In the case of property described in paragraph (1)(C), the court may, in addition to any other action authorized by this subsection, order the defendant to return the property to the jurisdiction of the court so that the property may be seized and forfeited.

21 U.S.C. § 853(p).

Here, the instant indictment clearly puts Defendants on notice as to the Government's intention to seek forfeiture of substitute assets, if necessary, under 21 U.S.C. § 853(p) in the event

of a conviction. (*See* Docket No. 2 at 15-16). In this Court's estimation, this notice is sufficient under Rule 7(c)(2) of the Federal Rules of Criminal Procedure. Accordingly, Defendants' motion to dismiss the allegations seeking forfeiture of substitute assets is DENIED.

      c.     Conclusion as to Motion to Dismiss Forfeiture Allegations

Based on the foregoing, Defendants' Motion for an Order Dismissing the Indictment's Forfeiture Allegations [34] is DENIED.

  B.    *Motions for Bills of Particulars*

    1.    <u>Legal Standard</u>

Defendants have each independently requested a bill of particulars, asserting specific requests for particulars to be contained in such a bill. (Docket Nos. 31, 36). Rule 7(f) of the Federal Rules of Criminal Procedure governs a criminal defendant's request for a bill of particulars and provides that:

> [t]he court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 10 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

FED R. CRIM. P. 7(f). "A bill of particulars is a 'formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor [.]'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005)(quoting BLACK'S LAW DICTIONARY 177 (8th ed. 2004)). The purpose of a bill of particulars is to ensure that a defendant has enough information to adequately prepare a defense, and is warranted when the information contained in an indictment is too vague or indefinite to allow such preparation. *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971), *cert. denied*, 405 U.S. 936 (1972).

A bill of particulars is akin to an indictment in that both are designed to limit the government's case. *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985). It is not designed, however, to provide a defendant with the "fruits of the government's case." *Id.* Therefore, a defendant may not use a bill of particulars as a wholesale discovery tool, though a defendant may not be denied legitimate information simply because that information would divulge government witnesses or details of the government's evidence. *Addonizio*, 451 F.2d at 64. However, where a defendant has access to information being relied upon by the government to construct its case, the case for granting a bill of particulars is significantly weakened. *Urban*, 404 F.3d at 772 (3d Cir. 2005).

Granting a motion for a bill of particulars is a discretionary matter for this Court. *Id.* The Court is to "balance the defendant's interest in securing information concerning the government's case [with] other countervailing considerations which may result from forcing the government to commit itself to a specific version of the facts before it is in a position to do so." *United States v. Rosa*, 891 F.2d 1063, 1067 (3d Cir. 1989). A bill of particulars should be ordered where the indictment "significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *Id.* at 1066. An indictment is considered sufficient if it substantially follows the language of the criminal statute, so long as it is not too general as to prejudice a defendant in preparing his defense or endanger his constitutional guarantee against double jeopardy. *United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991).

2.   <u>Discussion</u>

As noted, each Defendant has made a request for a bill of particulars, specifically requesting certain information from the Government regarding the charges set forth in the indictment. (Docket

Nos. 31, 36). With respect to the conspiracy charge at Count One, Defendants have requested the disclosure of specific information at each paragraph. (*Id*.). Primarily, Defendants seek information regarding the alleged amount of income received by Aquarian business operations, amounts deposited at financial institutions and and the amount of unreported income that was allegedly not included in the applicable tax returns. As to the specific transactions identified in Count One, Defendants request the following: (1) the source and amount of the income related to the transaction; (2) which Defendant made the transaction; (3) the date, time and location of the transaction; and (4) for the Government to identify the specific documents which support each transaction. (*See* Docket No. 31 at 1-8; 36 at ¶¶ 1-8).

Defendants also request certain information related to the charges of tax evasion, the filing of false returns and the alleged conspiracy to commit the same at Counts One through Seven. (Docket Nos. 31, 36). Specifically, Defendants request that the Government identify its method of proof at trial, i.e., the specific items method, net worth, bank deposit or expenditures method. In addition, Defendants seek information related to the line or lines on the applicable returns in which the income in question was allegedly omitted by Defendants. Finally, with regard to Count Eight and the five allegedly unlawful transactions identified therein, Defendants seek information similar to that sought in regard to the transactions at Count One, i.e., the source of the funds used in the transaction; which Defendant engaged in the transaction; the date, time and location of said transaction; and, the identification of any documents to be used by the Government in support of its allegations. (Docket No. 31 at 10; 36 at ¶ 11).

Defendants argue that a bill of particulars is generally warranted in complex matters such as the instant prosecution in which the discovery materials encompass approximately 45,000 to 50,000

pages of documents. (*Id.*). In response, the Government takes the position that a bill of particulars is generally not necessary, especially in a case such as the instant matter in which full discovery has been provided. (Docket No. 61 at 3-4).

Given Defendants' contentions, a brief discussion of the Government's potential methods of proving a tax evasion case at trial is warranted. As in any trial, the Government can elect to present direct or circumstantial evidence in support of its case. However, due to the complex nature of tax evasion cases, several methods of proof have been developed. "Under the specific items method, 'the Government ... produce[s] evidence of the receipt of specific items of reportable income by the defendant that do not appear on his income tax return or appear in diminished amount.'" *United States v. Thompson*, 518 F.3d 832, 853 (10th Cir. 2008) (quoting *United States v. Horton*, 526 F.2d 884, 886 (5th Cir.1976)); *see also United States v. Genser*, 582 F.2d 292, 295 n. 1 (3d Cir. 1978)(noting that under the specific items method of proof "it is sufficient to show that contrary to usual practices a defendant received certain payments in cash which were not in turn reported on income tax returns."). A leading treatise explains that:

> [t]he specific items method of proof is a direct method of demonstrating tax evasion in which the government produces evidence of the receipt of specific items of reportable income by the defendant that do not appear on her income tax return. This is the simplest method of proving tax evasion. Proof may consist of little more than the taxpayer's return, the testimony and records of a third party showing the payment of an unreported item of income to the taxpayer or the nonpayment of a claimed deduction by the taxpayer, and some element of willfulness. Because the specific items method is the easiest case to present to a jury, it is favored by prosecutors.

COMISKY, FELD AND HARRIS, TAX FRAUD AND EVASION ¶ 7.01[2][f] (6th ed. 2007)(internal citations omitted). As noted by Defendants in their motions, the Government could have elected to prosecute

this case by using a circumstantial method of proof, employing either the net-worth,[20] cash expenditures[21] or bank deposits[22] methods.  (Docket Nos. 36 at ¶ 9; 31 at 8).  Accordingly, it appears

---

[20]

The United States Court of Appeals for the Third Circuit has explained that:

> [u]nder the net worth method, the government attempts to establish by circumstantial proof the existence of unreported income by selecting an opening year for which it can reasonably ascertain the defendant's net worth and comparing that amount with a closing year's net worth. Any estimated nondeductible living expenses during that period are added to the closing net worth. The opening net worth is subtracted from the closing net worth to gauge the amount of unreported income the defendant must have had. But the government's burden does not rest there, it must then either prove that there is a likely source of the unreported income, or negate all possible nontaxable sources of that income.

*United States v. Goichman*, 547 F.2d 778, 780 (3d Cir. 1976)(internal citations omitted).

[21]

> [T]he 'expenditure theory' ... holds that if, during a given period, the taxpayer's expenditures exceeded the amount he has reported as income and his net worth at the end of the period is at least the same as it was at the beginning, then it may be concluded that his income tax return shows less income than he has in fact received.

*United States v. Goldstein*, 56 F.R.D. 52, 55, n. 8 (D. Del. 1972)(citing *United States v. Caserta*, 199 F.2d 905, 907 (3d Cir. 1952)).

[22]

> The bank deposits method is intended to demonstrate the existence of unreported income through an analysis of the taxpayer's bank deposits and is used when the taxpayer's financial records are incomplete or do not accurately reflect income.  This method of accounting relies heavily on circumstantial evidence, and because of this fact, the government must be particularly thorough in its development and presentation of the evidence used to demonstrate the presence of unreported income.

COMISKY, FELD AND HARRIS, TAX FRAUD AND EVASION ¶ 7.01[2][i] (6th ed. 2007)(citing *United*

to the Court that many of the particulars sought in Defendants' respective motions were requested to ascertain not just the Government's method of proof, but the underlying evidence in support of such methods. Those requests primarily included the dates and amounts of each alleged transaction and the financial institutions and post offices at which each alleged transaction took place. However, the Government has agreed to produce this information to Defendants, albeit in a different form than a traditional bill of particulars.

At oral argument, Defendants focused their argument on the need to discover the Government's theory of the case, primarily seeking the method of proof to be used by the Government at trial. (Docket No. 101 at 33, 39). In response, the Government represented that it intended to prove its tax evasion case against Defendants at trial using the specific items method. (Docket No. 101 at 40-41). Defendants did not respond to this proffer or concede that this obviated the need for a bill of particulars as to these counts. (Docket No. 101 at 41).

At the close of oral argument, the Government also made certain representations as to how it intends to present its voluminous evidence at trial, including by the use of charts and other summary forms of evidence. (Docket No. 101 at 58-61). The Government also agreed to produce these summary exhibits to Defendants in advance of trial and to work with defense counsel to come to an agreement as to the admissibility of the exhibits at trial. *Id*. Specifically, the Assistant United States Attorney offered the following:

> There will be a lot of exhibits, but in terms of what my intent will be, I want to give notice. The exhibits would include the supporting bank records for the deposits made by Aquarian, and what I intend to do is seek to offer these exhibits as being under Rules 902(11) and 803(6) rather than bring in the custodians because what we would have here

*States v. Wiese*, 750 F.2d 674 (8th Cir. 1984)).

with respect to the bank records, Your Honor, would be approximately 25 different banks, 29 different banks, and rather than bring in 29 custodians, what I would like to do is have certifications submitted to the Court concerning the authenticity of these records, all of which have been provided to defense counsel, and rather than go through each of these records in court at trial with a witness, what I wanted to do was present it in the form of summary testimony with summary charts under Rule of Evidence 1006.

I would propose to do something along the same lines with the postal money orders, that is, have a certification indicating that these are in fact the authentic records of the United States Postal Service and have summary charts prepared.

Finally, with the Greek Catholic Credit Union, I would want to do the same thing. Again, it would be to get a certification regarding the authenticity of the underlying records that would be summarized in charts and offered under Rule 1006. I would have the charts prepared far in advance of trial and provide those to defense counsel so that they then could, if they deemed it necessary, check with the underlying records to make sure that the charts accurately summarize those documents.

We would offer tax returns for 2001, 2002, 2003, that is the corporate tax returns which are set forth I believe in Counts 2, 3, and 4 -- I am sorry, 5, 6, and 7. And we would have the tax returns, that is the joint 1040s, for the years 2001, 2002, 2003, which are Counts 2, 3, and 4. We would have the specific deposit records for Count 8 rather than just in a summary chart form. We would have records from Bobby Rahal where the Mercedes was purchased. We would have the sales receipt, the money orders that were specifically used to make payment on that, and I believe there is a letter also that we got from Bobby Rahal that has been turned over to defense counsel. But that at this point, Your Honor, I think is an accurate summary of the records. And I know that that speaks to a lot of records and I would like to work out with defense counsel ahead of time possibly what we should do with these huge bulk of records that we would be offering. Maybe not even present them to the jury at all if we could reach an agreement on the summary charts or, if necessary, offer them and not necessarily go through them all one at a time, but instead refer to the summary charts; and if the jury would deem it necessary to look at the underlying records, to do it that way. I guess to get a little more specific on the banks, since there are 29 different banks, what I would

do is submit separate group exhibits for each bank. Similarly with the postal money orders, I would have group exhibits that are organized based on the dates on which they were purchased.

At this point I don't think we will have anymore documentary exhibits. But that's my intention in terms of how to offer them. It's voluminous and I want to make it as streamlined as possible. So I would like to get together with defense counsel prior to trial once we get notice of a trial date and try to reach agreement on the most efficient way to present this. I am not sure, they may want to bring out individual documents, that's understandable, and challenge the charts or look at specific dates and transactions, but I don't know that yet.

*Id.*

Accordingly, the Court finds that the proffer as to use of the specific items method, coupled with the specific allegations in the indictment, the Government's repeated meetings with defense counsel to exchange information, the production of discovery materials to Defendants and the Government's notice of its intent to present its evidence at trial in summary form and to produce such summary exhibits to Defendants in advance of trial, all obviate the need for a bill of particulars in this instance.

The Court recognizes that it is within its discretion to grant Defendants' motions and order the Government to file a bill of particulars. However, to the extent that Defendants' motions seek the disclosure of the Government's method of proving the tax offenses at trial, the Government has responded to these requests, proffering that it intends to prosecute this case using the specific items method. (Docket No. 101 at 40-41). Accordingly, Defendants' motions in this regard are denied, as moot. Further, many of the cases cited by Defendants in support of their motion are distinguishable given the Government's proffer as to its prosecution of this matter under the specific items method. *See United States v. DeGroote*, 122 F.R.D. 131 (W.D. N.Y. 1988)(ordered bill of

particulars as the government elected to proceed under multiple methods of proof); *United States v. Goldstein*, 56 F.R.D. 52 (D. Del. 1972)(ordered the government to disclose its method of proof, among other particulars); *United States v. Hedman*, 458 F.Supp. 1384 (D.C. Ill. 1978)(same); *United States v. O'Neil*, 20 F.R.D. 180 (E.D.N.Y. 1957)(same); *United States v. Jaskiewicz*, 278 F.Supp. 525 (D.C. Pa. 1968)(ordered bill of particulars as the government elected to prosecute based on the net worth method).

Moreover, with respect to Defendants' remaining requests, given the extensive discovery in this case, Defendants' case for a bill of particulars is weak. *See Urban*, 404 F.3d at 772. In this Court's estimation, Defendants' position is further weakened by the Government's representation that it intends to produce much of the information requested by Defendants in the form of charts and/or summary exhibits and to provide Defendants with the same well in advance of trial. *See United States v. Wheeland*, 25 F.R.D. 481 (M.D. Pa. 1960)(ordered bill of particulars but did not consider whether discovery had been produced); *United States v. Earnhart*, 683 F.Supp. 717 (W.D. Ark. 1987)(same).

Defendants further maintain that this Court should consider the complexity of the offense in evaluating their motion for a bill of particulars, and contend that courts are generally more apt to grant such a motion in a tax evasion case, which is ordinarily complex. (Docket No. 37 at 3). While the instant matter is a tax case, the Court finds that it is not inherently complex, as it involves husband and wife defendants who operate a small, closely-held business. The business employs four or five employees and hires an independent accountant to process its tax returns. (Docket No. 61-3 at ¶ 12). The instant indictment alleges that Defendants engaged in a conspiracy to commit tax evasion, file false returns and unlawfully structure currency transactions over a period of five years

as well as substantive counts of these offenses. (Docket No. 2). The indictment details that Defendants did not report all of the income generated by their business and structured certain purchases of money orders and deposits with financial institutions in amounts calculated to avoid the filing by those institutions of currency transactions reports, thereby avoiding potential scrutiny. (*Id.*). To the extent that the indictment does not detail the transactions at issue, as discussed above, the Government has provided Defendants with significant discovery and will produce to Defendants the documentary evidence that it plans to present at trial in summary form. This matter is therefore distinguishable from several of the cases cited by Defendants in that it is not a complex RICO case, *United States v. Thevis*, 474 F.Supp. 117 (D.C. Ga. 1979), or anti-trust action, *United States v. Greater Syracuse Bd. of Realtors, Inc.*, 438 F.Supp. 376 (D.C. N.Y. 1977).

After carefully balancing the Defendants' rights against those of the Government, *see United States v. Rosa*, 891 F.2d at 1067, the Court concludes that a bill of particulars is not warranted based on the circumstances of this case. Defendants have not demonstrated that the allegations in the indictment, when considered in light of the significant discovery; the Government's proffers as to its chosen method of proof at trial and its presentation of voluminous evidence related to the allegedly unlawful transactions at trial, are so general as to "significantly impair" their ability to prepare for their defense or that the denial of their motion will lead to "prejudicial surprise at trial." *Id.* at 1066. Accordingly, Defendants' motions [31] and [36] are DENIED.

C.      *Motion for Severance of Co-Defendants*

Defendants have also filed a motion to sever, arguing that they will be prejudiced if they are tried jointly. (Docket No. 53). The Government contends that severance is not warranted, citing the clear preference in the federal system for joint trials of co-defendants. (Docket No. 77).

1.    Legal Standard

Pursuant to Rule 8(b) of the Federal Rules of Criminal Procedure, two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. FED. R. CRIM. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together", *Zafiro v. United States*, 506 U.S. 534, 537 (1993), "and where defendants are charged with a single conspiracy", *United States v. Sandini*, 888 F.2d 300 (3d Cir. 1989). *See also United States v. Voight*, 89 F.3d 1050, 1094 (3d Cir. 1996)("joint trials of defendants charged under a single conspiracy aid the finder of fact in determining the full extent of the conspiracy and prevent the tactical disadvantage of the government from disclosure of its case.")(internal quotations omitted). Joint trials "play a vital role in the criminal justice system," *Richardson v. Marsh*, 481 U.S. 200, 209 (1987), as they promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210.

Rule 14 of the Federal Rules of Criminal Procedure governs the severance of defendants and provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder of ... defendants ... for trial together, the court may ... grant a severance of defendants." FED. R. CRIM. P. 14. A defendant seeking severance from a co-defendant bears a "heavy burden and must demonstrate not only abuse of discretion in denying severance, but also that the denial of severance would lead to clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005)(internal quotations and citations omitted); *see also United States v. Balter*, 91 F.3d 427, 433 (3d Cir. 1996) (same). "'A defendant is not entitled to severance merely because the evidence against a co-defendant is more damaging than that against him.'" and

"[s]ome exacerbating circumstances, such as the jury's inability to 'compartmentalize' the evidence, are required." *United States v. Adams*, 759 F.2d 1099, 1112-1113 (3d Cir.1985) (quoting *United States v. Dansker*, 537 F.2d 40, 62 (3d Cir.1976)); *see also Urban* 404 F.3d at 776 (quoting same). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). However, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro,* 506 U.S. at 538-39.

2.    Analysis

Defendants argue that the following trial rights will be violated if the Court permits a joint trial of the charges against them:  (1) Mrs. Manfredi's Sixth Amendment right of confrontation by the admission of the contents of an interview given by Mr. Manfredi to IRS agents; (2) their privilege to refrain from testifying as to marital communications; and (3) their privilege to refrain from offering testimony adverse to their spouse.  (Docket No. 53).  The Court will analyze each of Defendants' contentions, in turn.

a.    Confrontation Rights under *Bruton*

Defendant Samuel Manfredi was interviewed by Special Agent John Q. DiLucente, Internal Revenue Service, and Special Agent Ken Wiloch, United States Postal Service, on July 22, 2002 at which time Mr. Manfredi was questioned regarding his business' accounting practices.  (*See* Docket No. 61-3).  The interview was not recorded and was not adopted by Mr. Manfredi as his statement. The content of the interview has been preserved in the form of a memorandum prepared by Special Agent John Q. DiLucente who "prepared this memorandum on July 23, and July 24, 2002 after

refreshing my memory from notes[23] made during and immediately after the interview with Samuel J. Manfredi." (Docket No. 61-3). The Government seeks to introduce the content of this memorandum at trial through the testimony of one or both of the agents. (Docket No. 77). Co-Defendant Marilyn Manfredi was not present during this interview nor was she interviewed by either agency regarding the charges. Defendants maintain that Mr. Manfredi's responses to the agents' questioning directly implicate his wife, which the Government contests.

In his memorandum, Special Agent DiLucente reported the following:

1.    Manfredi stated that he currently owns and operates Model Talent Management and Aquarian Associates Inc. He travels around the country doing various conventions.

At this point Manfredi asked why we were here and what all the questions were about. Manfredi was informed that the reason that Special Agent Wiloch and I wanted to speak with him concerned the postal money orders that he purchased a few years ago. We told him that it was suspicious for someone to travel to several post offices in a two-day period purchasing $2,500 money orders that totaled $50,000. Then the $50,000 in money orders was used to purchase a $70,000 Mercedes. Manfredi agreed that the transactions did appear suspicious and understood why we were inquiring into the matter.

2.    Manfredi said he did not like to carry a large amount of cash around. "It was dangerous", he said. The cash came from customers of his business relative to conventions that he ran. The conventions were held three times per year (June, July and November). Of the three conventions, two were held in Pittsburgh (Greentree Marriott) and one was in Los Angeles (Airport-Sheraton). Manfredi has been conducting these conventions since 1986 and has done at least three per year for the last ten years or so.

3.    Manfredi advertised for the convention on television, radio, newspaper, at public events, at college campuses, in high

---

[23]

The Court has requested production of these notes. (Docket No. 101 at 49-50).

school football programs, etc. Prior to attending the convention, potential customers were subjected to a screening process. The screening process involved the potential customers showing up and there various talents were evaluated. There was no fee for the screening process. Normally between 1000 and 2000 people showed up at the screening process. If the participants made it through the screening process, they could attend the convention. There are normally between 700 and 800 people that attend the convention in Pittsburgh. In Los Angeles the number is between 600 and 700.

4.     At the convention, all customers are currently required to pay $439. In the past ten years the fee may have been as low as $300. The customers pay by cash, check and credit card. The method of payment by the customers varies at each convention. The money taken in by Manfredi's business could be estimated by multiplying the average number of attendees by $439. [So for example, a convention in Pittsburgh that normally averages 750 attendees can be multiplied by $439 to arrive at $329,250.].

5.     At the convention, the potential clients attend a simulated photo shoot, a fashion walk, and a "cold read" or a "commercial read". Manfredi explained that this was simply a practice commercial played out by the potential clients. The conventions were held on Friday, Saturday and Sunday. Each participant attends two of the three days.

6.     Manfredi insisted that he fully reported all of his convention money, including the cash received from each and every convention he ran.

7.     Manfredi was asked why he purchased postal money orders at several locations within a two-day period, Manfredi said "he believed that you were only able to purchase $2,500 at each location". He used the money orders, which totaled approximately $50,000 to purchase a Mercedes at Bobby Rahal. Manfredi explained that he accumulated the cash over several years and kept the cash at his residence. He said, "I like to save a lot". Manfredi said that this cash accumulation at his residence was wiped out after he purchased the money orders for the Mercedes.

8.	Manfredi said that he presently maintains four (4) or five (5) bank accounts.  The accounts are at PNC Bank, Dollar Bank, etc.  He said he utilizes a few different banks because he never knows where he's going to be when he has money he needs to deposit.  Manfredi has numerous Certificate of Deposits (CD's) at various banks.  Manfredi and his wife have an annuity at the Greek Catholic Union where he frequently makes deposits.  He explained that it is a fraternal organization related to his church.

9.	Jim Hutchinson is a former partner of Manfredi's.  They were partners in the Model Management Division.  Hutchinson left approximately five years ago to pursue other interests.  He was interested in developing property.

10.	Rascals, Model Management and Aquarian were the three businesses in which Manfredi was affiliated.  The businesses occupied various office locations in the eastern suburbs of Pittsburgh including: the DeMarco-Durzo Building in Monroeville, Penn Center, Ardmore Blvd, and finally Rodi Road in Penn Hills.  Each office move was related to rising rental costs.  Manfredi has no offices in Los Angeles.

11.	The three sources of income for Manfredi's businesses (excluding conventions) include, Professional Development, Preparation for Modeling, and Seminars.  Customers come to the Rodi Road office to obtain these services.  Manfredi collects a commission on any models he refers to potential clients.  Sometimes they even collect a second commission for a service charge but this does not always occur.  The customers of Manfredi pay by check, cash and credit card.

12.	Manfredi has four or five employees at his office.  He has a full-time photographer (Brian Luptak), and a few receptionists that also conduct interviews of customers for Manfredi.  There is also a part time make-up artist and seminar speakers.

13.	Manfredi's accountant is L.R. Gaus & Associates.  They are located on the North Side near the site where the Pittsburgh Steelers used to practice.  It is on Reedsdale St.  Craig McMillian is the accountant that handles Manfredi's tax affairs.

14. Manfredi maintains a checkbook at his office along with some sort of journal where he records daily business transactions. Whoever is available in the office at a particular time will record the information in the book. It may be Manfredi, his wife or one of the girls. The books are given to the accountant who prepares the payroll and all tax returns information. Manfredi emphasized that he makes a point to always have his tax information given to his accountant on time. He said, "I am very meticulous about that".

15. The deposits for the business are made on a daily basis. They are made by whoever is available to make the deposit. They are made at PNC and Dollar bank.

The interview concluded at this time.

(Docket No. 64-3).

Defendants contend that the references to Mrs. Manfredi contained in this memorandum directly implicate her and, therefore, require severance of the defendants for trial in this matter. Specifically, Defendants maintain that:

> [d]uring the IRS interview, Samuel Manfredi allegedly made statements indicating that he is the owner of Aquarian Associates Incorporated; that he and his wife, defendant Marilyn Manfredi, own an annuity at the Greek Catholic Union where he frequently made deposits; and, that his wife was one of the persons who recorded daily business transactions for his businesses. The statement reveals the marital relationship between the defendants and the fact that they worked together.

> The nature of the alleged offenses and the alleged actions of the defendants are so dependant upon the marital and business relationship of the defendants, any statement that incriminates Samuel Manfredi directly incriminates Marilyn Manfredi.

(Docket No. 64 at 5). Defendants then argue that without severance, Mrs. Manfredi's rights under the Confrontation Clause to the Sixth Amendment will be violated. (Docket Nos. 64, 95).

The Confrontation Clause to the Sixth Amendment guarantees that "[i]n all criminal

prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

U.S. Const. amend VI. In the decision of *Bruton v. United States*, the Supreme Court held that the

introduction of a co-defendant's confession against the defendant which implicated the defendant

in the commission of the crimes violated the defendant's rights under the Confrontation Clause, even

though the trial court had instructed the jury to disregard the evidence of the confession against the

defendant. *Bruton v. United States*, 391 U.S. 123, 134-37 (1968). The United States Court of

Appeals for the Third Circuit has explained that "*Bruton* and its progeny established that in a joint

criminal trial before a jury, a defendant's Sixth Amendment right of confrontation is violated by

admitting a confession of a non-testifying codefendant that implicates the defendant, regardless of

any limiting instruction given to the jury." *Johnson v. Tennis*, 549 F.3d 296, 298 (3d Cir.

2008)(citing *Richardson v. Marsh*, 481 U.S. 200, 211, (1987); *Cruz v. New York*, 481 U.S. 186,

193-194 (1987)); *see also Vazquez v. Wilson*, --- F.3d ---, 2008 WL 5264678 (3d Cir. Dec. 19, 2008).

"Admission of a co-defendant's confession can unquestionably jeopardize the fundamental fairness

of a criminal trial; an error embroiling the Sixth Amendment right to confront witnesses rates high

on the significance scale." *United States v. Richards*, 241 F.3d 335, 342 (3d Cir. 2001). The Court

of Appeals has further delineated that "[a] *Bruton* analysis is triggered where an admission of a co-

defendant is so 'powerfully incriminating' or 'devastating' that a limiting instruction fails to

adequately safeguard the defendant's Sixth Amendment rights." *United States v. McKee*, 506 F.3d

225, 249 (3d Cir. 2007).

This case is distinguishable from *Bruton* and its progeny. Initially, the interview summary

is far from a confession. Further, in this Court's estimation, during the interview with IRS and

Postal Service agents, no directly incriminating statements were made by Mr. Manfredi regarding

54

his wife, Mrs. Manfredi. Mr. Manfredi told the agents that he has an annuity at the Greek Catholic Union, which is jointly owned by his wife. (Docket No. 64-3 at ¶ 8). He also disclosed that he, his wife or "one of the girls" record daily business transactions for Aquarian in the company's journal and that business deposits were made on a daily basis "by whoever is available to make the deposit." (*Id*. at ¶¶ 14-15). These facts do not directly implicate Mrs. Manfredi in any criminal conduct and are not so "powerfully incriminating" that the Court cannot properly instruct the jury to not consider the same against Mrs. Manfredi. The disclosures by Mr. Manfredi that his wife recorded transactions and made deposits for Aquarian as well as shared joint ownership of an annuity with Mr. Manfredi each require external evidence to demonstrate any alleged illegality. *See Richardson v. Marsh*, 481 U.S. 200, 208-211 (1987)(distinguishing *Bruton* in that the co-defendant's confession was not incriminating on its face and only incriminating "when linked with evidence introduced later at trial"). In addition, Mr. Manfredi did not make any disclosures regarding his wife's involvement with the alleged structuring of currency transactions about which he was questioned, stating that he made the transactions. (Docket No. 2 at ¶ 7). Moreover, Mr. Manfredi expressly denied any wrongdoing related to the tax evasion charges during the interview, maintaining that he reported all of the cash/income received at his company's conventions to the IRS. (*Id*. at ¶¶ 6, 8).

Although the Government argues that the disclosures regarding Mrs. Manfredi during this interview were not directly incriminating, the Government has agreed not to introduce the facts told to the agents by Mr. Manfredi during this interview which arguably implicate Mrs. Manfredi. (Docket No. 77 at 7). In fact, the Government has asserted that it intends to prove joint ownership of the annuity account through alternative evidence. (*Id*. at 7). The Court acknowledges that redaction of the memorandum in order to obviate a *Bruton* issue is not possible. *See generally*

55

*Richardson*, 481 U.S. at 205-211; *Gray v. Maryland*, 523 U.S. 185, 187-195 (1998); *United States v. Richards*, 241 F.3d 335, 341 (3d Cir.2001). The Court also acknowledges that the Government intends to introduce Mr. Manfredi's interview through testimony of the involved agents. Accordingly, the Court will hold the Government to its representation that it will not introduce evidence against Mrs. Manfredi through the agents based on any disclosures made by Mr. Manfredi during the interview and will preclude the same at trial. Further, the Court will instruct the jury that the content of the July 22, 2002 interview of Mr. Manfredi by the agents is to be considered against Mr. Manfredi, only. The parties will be required to submit proposed limiting instructions as to this issue at the time of the pre-trial conference in this matter.

Having found that there is no serious risk that Mrs. Manfredi's rights under the Confrontation Clause would be violated by introduction of the contents of the interview memorandum at issue, with a proper limiting instruction, severance of the defendants is not warranted. Accordingly, Defendants' motion to sever on this basis is DENIED.

b. Marital Communications Privilege

Defendants also argue that their motion to sever should be granted on grounds that the privilege related to marital communications would be violated by a joint trial of the charges against them. (Docket No. 64 at 6-9). The Government objects to Defendants' motion on these grounds, arguing that severance is not warranted based on Defendants' "general, unarticulated concerns relating to the marital communications privilege in support of their request for severance." (Docket No. 77 at 10).

Rule 501 of the Federal Rules of Evidence governs the applicability of privileges in the federal courts, and provides that:

> [e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

FED. R. EVID. 501. With respect to the marital communications privilege, the United States Court of Appeals for the Third Circuit has held that:

> [t]he marital communications' privilege ... prevents a testifying spouse from disclosing confidential communications between the spouses. This privilege may be invoked by the non-testifying spouse, but only under certain conditions. A major limitation is that where marital communications have to do with the commission of a crime in which both spouses are participants, the conversation does not fall within the marital privilege.

*United States v. Hill*, 967 F.2d 902, 911 (3d Cir. 1992)(internal citations and quotations omitted); *see also United States v. Anmar*, 714 F.2d 238, 258 (3d Cir. 1983)("We join the other circuits in holding that communications between spouses pertaining to ongoing or future criminal activity, are not protected against disclosure by the privilege for confidential marital communications."). The marital communications privilege "reaches only those communications made in confidence and intended to be confidential", *Anmar*, 714 F.2d at 258 (quoting *Trammel v. United States*, 445 U.S. 40, 53 (1980)), and "generally, extends only to utterances, and not to acts", *Pereira v. United States*, 347 U.S. 1, 7 (1954). Thus, the non-testifying spouse has a privilege to prevent a testifying spouse from testifying as to statements made in private between the spouses, with a reasonable expectation of privacy. However, any acts, statements made in front of third parties, or statements made in furtherance of a criminal activity are not accorded such protection.

The premise of Defendants' motion is based on a hypothetical situation in which one of the

defendants in this matter testifies at trial.[24]  (Docket No. 64 at 8).  At oral argument, counsel for Mrs.

Manfredi was non-committal as to his client's decision to testify or not.  (Docket No. 101 at 44-45).

Mr. Manfredi has offered no position as to the potential for him to testify at trial.  In addition,

Defendants each have the ability to exercise their constitutional right against self-incrimination and,

therefore, may choose to not testify at trial on that basis.  *See* U.S. Const. amd. V ("No person ...

shall be compelled in any criminal case to be a witness against himself").  Moreover, the

Government has asserted that it will not compel either Defendant to testify against the other.  (*See*

Docket No. 77 at 11).

In her motion, Defendant Marilyn Manfredi sets forth an example of potential testimony that

Mr. Manfredi could give at trial.

> Here for example, it will be claimed that Marilyn Manfredi purchased a number of the money orders and thus Samuel Manfredi would be open to questioning regarding the surrounding circumstances.  Not only would he be subject to questions concerning the money order purchases, but management of the business and the wife's role therein, as well as the circumstances surrounding the filing of joint income tax returns are areas of questioning that will be explored at trial.

> Given the length and closeness of their relationship it is reasonable to assume that testimony that may be essential to Samuel Manfredi's defense would involve confidential communications with his spouse, defendant Marilyn Manfredi.

(Docket No. 64 at 8).  Defendant Marilyn Manfredi therefore objects to "any testimony that may be

offered by Samuel Manfredi if he were to testify."  (*Id*.).  Given Mr. Manfredi's joinder in this

---

[24]

The Court notes that this motion was initially filed by Mrs. Manfredi, (Docket No. 53), and then later joined by Mr. Manfredi. Accordingly, Mr. Manfredi has not made a similar proffer related to potential testimony of Mrs. Manfredi as Mrs. Manfredi has in the brief in support of her motion. (Docket No. 64).

motion, the Court will assume that he objects to similar potential testimony offered by Mrs. Manfredi at trial.

Based on the present record before the Court, Defendants have not met their "heavy burden" to establish that severance is warranted because of "clear and substantial prejudice" which would result in a "manifestly unfair trial" based on their potential assertion of the marital communications privilege. *Urban*, 404 F.3d at 776. First, there has been no proffer that Mr. Manfredi will actually testify at trial and the contents of his potential testimony have not been disclosed. Second, to the extent that Mrs. Manfredi has made a proffer relative to her motion to sever based on her assertion of the privilege against adverse spousal testimony, she is non-committal as to her desire to actually testify at trial[25] and Mr. Manfredi has not specifically sought to preclude this proffered testimony by asserting the marital communications privilege. Third, Defendants' argument that "any testimony" of either co-defendant is protected by the marital communications privilege is overbroad in that several recognized exceptions to the privilege exist. Thus, Defendants are not entitled to a blanket order precluding all testimony of a spouse, but can only preclude those marital "communications made in confidence and intended to be confidential." *Anmar*, 714 F.2d at 258. Likewise, Defendants are not entitled to severance based on the flawed premise that all testimony of a spouse can be precluded under this privilege. Fourth, to the extent that Defendants seek to assert the privilege to

---

[25]

(*See* Docket No. 101 at 44-45)(At oral argument, Mrs. Manfredi's counsel asserted that "I believe here that she is more than likely to testify in her own defense because I think that it is -- the way I see it at this point, and obviously it's always subject to how does the case go in, and my mind has been changed a million times one way or the other just before we are ready to go for the defense, but it seems to me that she needs to testify in her own defense. She needs to explain just exactly what her role was in connection with various deposits or other items which the Government has alleged in their indictment.").

prevent the testimony of the non-testifying spouse regarding certain acts including financial transactions, i.e., purchases of money orders and deposits of certain funds into bank accounts, such acts are not protected by the marital communications privilege. Fifth, as indicated in its response, the Government would likely contest any assertion of the marital communications privilege by arguing that the communications were made in pursuit of ongoing criminal activity and, thus, are not privileged. (Docket No. 77 at 8-10). Without a proffer of specific testimony to be offered, the Government can only generally object to the potential testimony, as they have done here.

Based on the foregoing, Defendants' motion for severance under the marital communications privilege is DENIED.

c.      Adverse Spousal Testimony

Lastly, Defendants assert that severance is warranted based on the privilege against adverse spousal testimony as recognized by the United States Court of Appeals for the Third Circuit in *In re Grand Jury,* 111 F.3d 1083, 1086 (3d Cir. 1997) and *In re Malfitano*, 633 F.2d 276, 280 (3d Cir. 1990). (Docket No. 61 at 9). Mrs. Manfredi argues that "a joint trial prejudices her by forcing her to choose between testifying in her own behalf and exercising her right not to testify adversely against her spouse." (*Id*.). Defendants cite two decisions in the District Court for the Eastern District of Pennsylvania, *United States v. Dobson*, 2003 WL 22427984 (E.D.Pa. August 18, 2003) and *United States v. Ali*, 2005 WL 697482 (E.D. Pa. March 24, 2005) in support of their position. (*Id*.). In response, the Government contends that severance is not warranted under the circumstances of this case and further submits that the decisions in *Dobson* and *Ali* were wrongly decided, citing to *United States v. Binns*, a decision from the District Court for the Eastern District of Missouri, 2007 WL 120706 (E.D. Mo. 2007), which it argues rejects the reasoning of *Dobson* and *Ali*. (Docket

No. 77 at 11-12). The Government also maintains that Defendants have failed to meet their burden because their arguments rely on "bald assertions that they 'may' testify, and that if they choose to do so, their testimony 'may potentially' inculpate their respective spouses." (*Id*. at 15). In her reply brief, Mrs. Manfredi urges the Court to reject the district court's reasoning in *Binns*, and presents a proffer of Mrs. Manfredi's potential testimony at trial. (Docket No. 95 at 11-15). In turn, the Government filed a supplemental notice with the Court, citing *United States v. Ferrer*, 2008 WL 4890034 (M.D. Pa. Nov. 12, 2008), which it also submits rejects the reasoning of the decisions in *Dobson* and *Ali*. (Docket No. 99).

As stated, Mrs. Manfredi proffers that the substance of her potential testimony at trial would involve the following.

> Marilyn Manfredi states that her testimony may involve the nature of her record-keeping duties and directions she received regarding those duties that may inculpate her husband, Samuel Manfredi. Further, Mrs. Manfredi may testify with respect to cash deposits made on behalf of Aquarian and, specifically, directions received by her regarding those deposits that could inculpate her husband. In the absence of any grant of usefruits immunity and a promise not to use her statements against Samuel Manfredi, Mrs. Manfredi cannot be more specific in such a proffer.

(Docket No. 95 at 14-15). At oral argument, while being non-committal as to Mrs. Manfredi's actual decision of whether to testify at trial or not, Mrs. Manfredi's counsel further articulated the proffer of her testimony at trial, stating that:

> If my client discusses a conversation that she had with her husband about purchasing, let's say, a money order in a certain denomination and she recaps that conversation in such a way that it demonstrates that she was simply going out to purchase it pursuant to not instructions per se, it seems to me, but simply a directive of, go here, buy this for this amount of money, it seems to me that it's pretty obvious that a jury could evaluate that and say one individual had no

cognitive part in making that decision and some other individual had a very cognitive part in making that decision and find that that's incriminating and find with regard to my client that it's not incriminating. That's pretty basic stuff.

As I say, I would be in a position to elaborate on that, but I think it's fairly obvious as to what I am saying with regard to this. There was a division of authority in the company, who handled the business as opposed to who handled the other aspects of the company. All of those things would tend to exonerate one and the Government would use that to try to incriminate Mr. Manfredi, even though I believe that when this is over it will be clear that Mr. Manfredi didn't commit a crime either, the Government will attempt to use that information against him in a detrimental way which will put a stake, if you will, in the heart of any marriage, no matter how long and how strong.

(Docket No. 101 at 54-55). In sum, Mrs. Manfredi's proffer is that she may testify in a manner that would show that she had no decision making authority regarding her involvement, if any, in the transactions in question and that she was directed by Mr. Manfredi to make said transactions, presumably in specified amounts, on certain dates and at certain locations.

A defendant's right to testify on his or her own behalf at a criminal trial is unquestionably protected by the United States Constitution. *See United States v. Legett*, 162 F.3d, 237, 244 (3d Cir. 1998)(citing *Rock v. Arkansas*, 483 U.S. 44, 51 (1987)). With respect to the privilege against adverse spousal testimony,[26] the United States Court of Appeals for the Third Circuit has held that:

[t]he privilege against adverse spousal testimony, which prevents one spouse from being compelled to testify against the other, rests with the testifying spouse, who may choose to waive it. This privilege, designed to protect the marriage relationship as it exists at the time of trial, "applies to all testimony of any kind."

*Ammar*, 714 F.2d at 258 (citing *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63

---

[26]

As with the marital communications privilege, Rule 501 of the Federal Rules of Evidence governs the applicability of the privilege against adverse spousal testimony in federal court.

L.Ed.2d 186 (1980) and quoting 2 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE 2d § 406 (1983)). "The crux of this privilege is that a person may not be forced to be a witness against his or her spouse in a criminal proceeding." *Malfitano*, 633 F.2d at 277. Thus, any testimony, particularly when offered in one's own defense, which is adverse to a spouse, is protected under the privilege, if the testifying spouse wishes to exercise this privilege.

Upon consideration of the parties' submissions and the cases cited in support of and in opposition to Defendants' motion, the Court is persuaded by the reasoning of the district court in *Ferrer*. In *Ferrer*, similar to the case at bar, the defendant sought severance based on the privilege against adverse spousal testimony, arguing that "a joint trial would place her in the position of choosing between testifying on her own behalf and asserting her privilege against testifying against her husband." *Ferrer*, 2008 WL 4890034, at *3. The district court framed the issue before it as a conflict between the defendant's Constitutional right to testify on her own behalf and the privilege against adverse spousal testimony, rejecting the *Dobson* court's characterization of the same issue as a conflict between two fundamental rights. *Id.* at *3-4. The district court also disagreed with *Dobson*'s interpretation of the Court of Appeals' decision in *Anmar*, that "district courts should resolve conflicts between the privilege against adverse spousal testimony and the right to testify 'by severing the trials of spouses.'"[27] *Id.* at *4 (quoting *Dobson*, 2003 WL 22427984, at *2). Finally, the district court in *Ferrer* rejected a "bright-line rule favoring severance anytime a perceived conflict between the right to testify and the privilege against adverse spousal testimony arises ... in

---

[27] In a footnote, the district court also rejected reasoning by the district court in *United States v. Ali*, 2005 WL 697482, for following the *Dobson* court's interpretation of the privilege against adverse spousal testimony. *Ferrer*, 2008 WL 4890034, at *4 n. 4.

favor of a fact sensitive inquiry focused on whether failure to sever creates a serious risk" that one of the defendant's trial rights will be affected. *Id*. at *4-5. The *Ferrer* court then conducted such an inquiry, finding that the defendant did not meet her burden to show that there was a serious risk that one of her trial rights would be violated based on the facts before the court. *Id*. at *6.

The decision in *Dobson* is also distinguishable from the instant matter, as noted by the district court in *Binns*, because the Government in that case did not dispute that the testimony of the defendant in *Binns* would exculpate him but would tend to inculpate his wife. *Dobson*, 2003 WL 22427984, at *1; *Binns*, 2007 WL 120706, at *8. Here, the Government contests that Mrs. Manfredi would actually testify at trial and that the proffered testimony by Mrs. Manfredi would potentially inculpate her husband. (Docket No. 77).

Utilizing a fact based inquiry to resolve this issue, as articulated by the district court in *Ferrer*, is supported by Rule 14. Requiring a defendant to meet a "heavy burden" to demonstrate a "clear and substantial prejudice resulting in a manifestly unfair trial", *Urban*, 404 F.3d at 776, is also necessary.

Applying the fact based inquiry in *Ferrer* to the instant matter, the Court finds that Defendants have not met their burden to prove that severance is warranted. In her proffer, Mrs. Manfredi generally asserts that she may testify in her own defense regarding her lack of cognitive awareness of certain allegedly unlawful transactions in this case. Her right to testify in such a manner is unquestioned by this Court. She also states that she may testify regarding her bookkeeping duties at Aquarian, deposits that she made on behalf of the company as well as purchases of money orders and that she performed these duties pursuant to the direction of her husband. She then argues that her testimony will likely result in an adverse inference against her husband, which inference

could be used by the Government to implicate him in the charged crimes. In conjunction with her proffer, she proclaims that her husband is innocent of the charges against him; a proclamation which was echoed by Mr. Manfredi's counsel at the hearing. (Docket No. 101 at 34, 55).

As stated, Mrs. Manfredi's proffer is general in nature. However, the indictment contains specific allegations that she and her husband engaged in a conspiracy to commit offenses against the United States that took place over a period of 5 years and involved numerous transactions. (Docket No. 2). The "Overt Acts" portion of the indictment charges that Mrs. Manfredi engaged in multiple transactions including the following: (1) that on or about March 30, 2000, she and her husband purchased "74 United States Postal Service money orders with United States currency having a total value of approximately $42,300.00" at 17 different post offices, each made payable to Bobby Rahal Motorcar Company; (2) that on or about April 3, 2000, Mrs. Manfredi "purchased a 2000 Mercedes Benz automobile at Bobby Rahal" with 86 postal money orders and $8,800.00 in cash; and (3), that on or before April 25, 2002, Mrs. Manfredi purchased nine (9) postal money orders worth $6,300.00 at post offices in Norwood, Massachusetts. (*See* Docket No. 2 at ¶¶ 16, 17, 18). In addition, Count Eight alleges that Mrs. Manfredi and her husband unlawfully engaged in the structuring of five transactions at five different banks on May 17, 2002 in violation of 31 U.S.C. § 5324(a)(3) and 18 U.S.C. § 2. (Docket No. 2 at 15). Mrs. Manfredi's proffer does not identify which, if any, of these transactions were ones she was allegedly directed to conduct by her husband. Moreover, Mrs. Manfredi's proffer does not directly address the charges of conspiracy to commit tax evasion and willfully filing of false returns or the substantive counts of tax evasion filed against her. (Docket No. 2 at 9-11).

In this Court's estimation, Mrs. Manfredi's general allegations regarding the potential

prejudice she may suffer if the instant matter is not severed are insufficient to meet her "heavy burden" that she will be prejudiced by a manifestly unfair trial if her motion to sever is not granted. The record before the Court at this time does not demonstrate such prejudice. Like the district court in *Ferrer*, this Court can only speculate as to potential prejudice that she may suffer in the event that she chooses to testify. It is not clear to the Court based on this record that Mrs. Manfredi will be presented with an irreconcilable conflict between her right to testify in her own defense and her privilege to not testify adversely against her spouse or, if such a conflict exists, that severance is the proper relief to be granted.[28] *See Zafiro,* 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."). Accordingly, based on the current record, Defendants' motion for severance relying on the privilege against adverse spousal testimony is DENIED.[29]

## V.    CONCLUSION

Based on the foregoing, the disposition of Defendants' motions are, as follows:

A.    Defendants' *Motion to Dismiss Count One for Alleging Multiple Conspiracies* [38] is DENIED;

B.    Defendants' *Motion to Dismiss Counts One, Five through Seven, and Eight For*

---

[28]

The Court notes that given this holding, it need not resolve the Government's argument that the Court empanel dual juries as an alternative to severance of the Defendants at this time. (Docket No. 77 at 16-18).

[29]

The Court acknowledges that Mrs. Manfredi has proposed that if necessary, the Court conduct an *in camera* review of her potential testimony, (*see* Docket No. 101 at 45), a procedure which has not been formally requested by way of a written motion as of this writing. In the event Mrs. Manfredi still desires to proceed in that fashion, the Court will require a written motion and brief and will provide the Government an opportunity to respond.

*Failing To State an Offense and All of Its Forfeiture Allegations For Being Predicated on Defective Counts One and Eight* [40] is DENIED;

C.     Defendants' *Motion to Dismiss Indictment's Forfeiture Allegations* [34] is DENIED;

D.     *Motion for Bill of Particulars by Defendant Samuel Manfredi* [36] is DENIED;

E.     *Motion for Bill of Particulars by Defendant Marilyn Manfredi* [31] is DENIED; and

F.     *Motion for Severance from Co-Defendant by Marilyn Manfredi* [53] is DENIED.


It is so ordered on this 21st day of January, 2009.



_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


cc/ecf: All Counsel of Record.